REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

```
FILED
CLERK, U.S. DISTRICT COURT

OCT 19 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____RS_____ DEPUTY
```

Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Trevor T. Tan (State Bar No. 281045)
Makenna Cox (State Bar No. 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dgirard@girardsharp.com
jelias@girardsharp.com
ttan@girardsharp.com
mcox@girardsharp.com

Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
Amanda M. Karl (State Bar No. 301088)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com
amk@classlawgroup.com

Elizabeth A. Kramer (State Bar No. 293129)
**ERICKSON KRAMER OSBORNE LLP**
182 Howard Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088
Elizabeth@eko.law

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.B., C.D., E.F., G.H., I.J, K.L., and M.N., on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JAMES MASON HEAPS,<br><br>           Defendants. | Case No. 2:20-CV-09555-DMG-JPRx<br><br>**CLASS ACTION COMPLAINT**<br><br>**FILED UNDER SEAL PURSUANT TO PRIOR PROTECTIVE ORDER**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs A.B., C.D., E.F., G.H., I.J., K.L., and M.N., individually and on behalf of a class of women who were examined by James Mason Heaps, M.D. at the University of California, Los Angeles (UCLA), allege as follows.

## NATURE OF THE CASE

1.     Dr. James Heaps, an obstetrician-gynecologist (OB-GYN) specializing in oncology, saw patients at UCLA medical facilities between 1983 and 2018.  He was arrested in June 2019 and indicted on two counts of sexual battery and one count of sexual exploitation by a physician.

2.     Plaintiffs are four of the many women who visited Heaps for sensitive women's health treatment at UCLA.  Heaps caused lasting damage to them and his other patients by sexually assaulting them and making lewd statements while conducting medical examinations.

3.     UCLA breached its duties to Plaintiffs and other women by keeping Heaps on staff despite receiving numerous complaints about his behavior dating back to 1999 at the latest.  As part of a policy of indifference to sexual misconduct complaints against physicians at UCLA Health, UCLA failed to investigate or adequately investigate complaints about Heaps's conduct, and failed to terminate or suspend him during or after those investigations and complaints.  UCLA kept Heaps on staff even after the Medical Board of California opened its own investigation into his conduct in 2014.  UCLA nurses and medical assistants also attended Heaps's examinations and observed his predatory behavior but did nothing to stop it.

4.     More than 50 women have now come forward to report inappropriate sexual contact or comments by Heaps, and UCLA has paid over $3 million in individual settlements relating to Heaps's conduct.  In June 2018, without disclosing the results of its investigation—which found Heaps violated university policy on sexual violence—UCLA allowed Heaps to quietly resign.  Only after Heaps's arrest did UCLA issue a statement that it was "deeply sorry" that its women's health doctor violated "the trust of his patients."

CLASS ACTION COMPLAINT

5. Plaintiffs bring this action to obtain relief for themselves and other women who saw Heaps for treatment.

## JURISDICTION AND VENUE

6. The Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claim under Title IX of the federal civil rights laws, 20 U.S.C. § 1681 *et seq*. Additionally, under 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs' remaining claims, which arise under California law. The Court also has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332, because this is a proposed class action in which: (1) there are at least 100 class members; (2) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendants, Plaintiff A.B., and members of the class are domiciled in different states.

7. The Court has personal jurisdiction over the Regents of the University of California (the "UC Regents") because Heaps examined Plaintiffs and other women who comprise the proposed class in California, and because the UC Regents has sufficient minimum contacts with California to render the exercise of jurisdiction by this Court proper and necessary.

8. The Court has personal jurisdiction over Heaps by virtue of his citizenship of and residency in California.

9. Venue is proper in this District under 28 U.S.C. § 1391. A substantial part of the events and omissions giving rise to the claims occurred in this District.

## PARTIES

10. Plaintiff A.B. is a citizen and resident of Hawaii County, Hawaii.

11. Plaintiff C.D. is a citizen and resident of Los Angeles County, California.

12. Plaintiff E.F. is a citizen and resident of Los Angeles County, California.

13. Plaintiff G.H. is a citizen and resident of Ventura County, California.

14. Plaintiff I.J. is a citizen and resident of Los Angeles County, California.

15. Plaintiff K.L. is a citizen and resident of Los Angeles County, California.

CLASS ACTION COMPLAINT

16.     Plaintiff M.N. is a citizen and resident of Philadelphia County, Pennsylvania.

17.     Plaintiffs are using initials in this litigation to protect their privacy, and if required by the Court, will seek permission to proceed under pseudonyms.

18.     Defendant UC Regents is a California corporation headquartered in Alameda County, California.  The UC Regents serves as the governing board of the University of California and control its operations, including at UCLA.  The UC Regents is authorized to administer, and possess the exclusive authority to bind, UCLA Health System ("UCLA Health"), which includes Ronald Reagan UCLA Medical Center; UCLA Medical Center, Santa Monica; UCLA Mattel Children's Hospital; the Stewart and Lynda Resnick Neuropsychiatric Hospital at UCLA; UCLA Health Clinics; UCLA Faculty Group; and the David Geffen School of Medicine at UCLA.

19.     Defendant James Mason Heaps, M.D. is a citizen and resident of Los Angeles County, California.  Heaps began working for UCLA Health, in 1983.

## FACTUAL ALLEGATIONS

### A.     Heaps Assaulted Plaintiffs

#### 1.     A.B.

20.     In 2012, A.B. asked her primary care doctor at UCLA Health to recommend an OB/GYN.  Her doctor recommended that she visit Heaps.

21.     When Heaps first started seeing A.B., he told her that she should see him once every six months for a pap smear.  A.B. visited Heaps in 2012 and at least twice in 2013.

22.     In early 2014, A.B. had another OB/GYN appointment with Heaps for a regularly scheduled pap smear.  A nurse escorted her into an exam room and asked her to disrobe completely and put on a paper gown.  The nurse left the room and did not return.  No one else was present during A.B.'s visit.

23.     Heaps entered the exam room and said that he wanted to do a transvaginal ultrasound in addition to the pap smear.  A transvaginal ultrasound is a type of pelvic

3

CLASS ACTION COMPLAINT

ultrasound used to examine female reproductive organs.  A transvaginal ultrasound involves inserting an ultrasound probe two to three inches into the vaginal canal.

24.    After conducting the pap smear, Heaps began the transvaginal ultrasound. He aggressively inserted the ultrasound probe deep into A.B.'s vaginal canal.  He did not rotate the probe or move it to different areas, but instead kept pushing it straight and deeper inside her body.

25.    Throughout the procedure, Heaps looked only at A.B.'s face and did not look at the monitor showing the sonogram images.

26.    A.B. told Heaps that she was in severe pain.  Heaps said that the pain was normal and "all women feel it."  He continued to probe her aggressively, causing prolonged, severe pain, for at least 15 minutes.  A.B. stayed silent for the remainder of the procedure.  Although she was in pain and disconcerted that Heaps was staring at her face, A.B. assumed that what he was doing was medically proper and necessary.

27.    After about 15 to 20 minutes, Heaps said he was done and that A.B. could get dressed.  Although she was asked to (and did) disrobe from the waist up, Heaps did not conduct a breast exam during the appointment.

28.    Heaps did not explain the results of the transvaginal ultrasound during the appointment.  Nor did A.B. ever hear from anyone at UCLA Health about the results.

29.    Years later, A.B. had the same procedure performed by a different doctor. She did not experience any pain, and the doctor was looking at the monitor throughout the procedure.  That doctor told her that a transvaginal ultrasound is only necessary for certain symptoms and medical conditions.  She did not have any of those symptoms or conditions when Heaps performed the procedure.

30.    In or around October 2014, A.B. saw Heaps for her next regularly scheduled pap smear.  A nurse escorted A.B. into an exam room and asked her to disrobe completely and put on a paper gown.  The nurse left the room and did not return.  No one else was present during this visit.

CLASS ACTION COMPLAINT

31.   Heaps came into the room and said he was going to do a breast exam and pap smear.

32.   A.B. expected Heaps to palpate specific areas of each breast, as she had experienced during breast exams with other medical professionals.  Instead, Heaps fondled, cupped, and jiggled her breasts in a sexual manner, as if for his own sexual gratification or in an attempt to sexually stimulate her.  While he was fondling, cupping, and jiggling her breasts, Heaps stared at A.B.'s face and said nothing.

33.   A.B. was shocked and unable to speak or move while this was happening. Finally she turned her head toward Heaps and made eye contact.  At that point, Heaps pulled his hands away and said, "okay, we're going to do the pap smear now."

34.   After the pap smear, Heaps said he was done and that A.B. could get dressed.  He then left the room.  A.B. was still in shock when she left.  She felt violated but did her best to forget about what happened, resolving to find a different OB/GYN because she could not bear to see Heaps again.

35.   Her new doctor, who was also an employee of UCLA Health, told her that she did not need pap smears every six months (as Heaps had insisted), as once a year was enough.  A.B. saw the new doctor annually for a pap smear.  He never conducted or raised the possibility of her needing a transvaginal ultrasound.

36.   A.B. did not tell anyone about her experiences with Heaps because they were too painful to relive and because she felt embarrassed and ashamed.  She kept trying to convince herself that a UCLA doctor must have provided the highest standard of care and that, somehow, what happened was her fault.  A.B. tried to suppress her memories of her visits with Heaps—without success.

37.   A.B. feels deeply upset, demeaned, abused, and violated by Heaps.

38.   Heaps violated and injured A.B. by, among other things, (1) failing to advise and inform her of the procedures being performed, (2) aggressively probing her vaginal canal and causing her pain during an unnecessary transvaginal ultrasound, and

CLASS ACTION COMPLAINT

(3) fondling, cupping, and jiggling her breasts in a sexual manner under the guise of giving a breast exam.

39.     Because Heaps was an employee of UCLA Health, A.B. reasonably believed that Heaps's conduct must have been legitimate medical treatment.

40.     In June 2019, A.B. received a letter from UCLA stating that Heaps was "charged with sexual battery and sexual exploitation in connection with his medical practice."  UCLA noted in the letter that the criminal charges against Heaps were "very disturbing."

41.     After reading this letter, A.B. realized for the first time that Heaps's actions at her appointments were sexual assaults.  This realization has caused her to experience severe psychological and emotional distress. She suffered and continues to suffer from shock, embarrassment, humiliation, and disgrace.  She also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

## 2.     C.D.

42.     C.D. was referred to Heaps in or about early 2013.  Heaps was the first OB/GYN she saw since moving to the United States in 2010.

43.     Heaps told C.D. that she should come in once every three to six months for a pap smear.  C.D. therefore visited Heaps at three- to six-month intervals from her first appointment with him to her last appointment in June 2018.

44.     In 2015, C.D. saw Heaps for a regularly scheduled pap smear.  A nurse escorted C.D. into an exam room and asked her to disrobe completely and put on a paper gown.  The nurse left the room and did not return.

45.     When Heaps entered the exam room, he was accompanied by a female chaperone. The female chaperon was present for the entirety of the visit.

46.     Heaps asked C.D. to position herself on the exam table to be closer to him. She complied.  Heaps then began touching her legs and thighs without gloves on.  Still without gloves, Heaps touched her genital area, the opening of her vagina, and put his fingers inside her vagina.  He also inserted a speculum.  Heaps touched C.D. and used

CLASS ACTION COMPLAINT

his fingers to penetrate her in a sexual manner, as if for his own gratification or in an attempt to sexually stimulate her.

47.     After inserting the speculum, Heaps put gloves on and took a swab of her cervix.

48.     Throughout this 2015 visit, Heaps asked questions and made comments to C.D. about her sexual activity, including asking whether she was dating anyone and how frequently she had sex.  These questions and comments were unsolicited, unrelated to any medical issues that C.D. and Heaps discussed over the course of his treatment of her, and embarrassed C.D.  Heaps's statements and conduct during this visit made C.D. feel extremely uncomfortable, embarrassed, disgraced and humiliated.

49.     When Heaps completed the pap smear, he told C.D. he was done and that she could get dressed.  Heaps and the female chaperone left the exam room at the same time.  Although she was asked to (and did) disrobe from the waist up, Heaps did not conduct a breast exam during the appointment.

50.     Heaps's behavior disturbed and confused C.D.  She assumed, however, that given UCLA Health's excellent reputation and the fact that a female chaperone was in the exam room, Heaps must have been conducting the procedure appropriately, and that she was misunderstanding or overreacting to his sexual comments and questions.

51.     C.D. came to the United States from England shortly before her consultation with Heaps.  C.D. also attributed the disturbing nature of her experience to American cultural norms, believing that Heaps's behavior, though disturbing and offensive to C.D, was acceptable in the United States.

52.     C.D. tried to convince herself that nothing improper had happened and did her best to forget about the visit.

53.     In 2016, C.D. saw Heaps for her next regularly scheduled pap smear.  A nurse escorted C.D. into an exam room and asked her to disrobe completely and put on a paper gown.  The nurse left the room and did not return.

CLASS ACTION COMPLAINT

54.     When Heaps entered the exam room, he was accompanied by a female chaperone. The chaperone was present for the entirety of the visit.

55.     Heaps said he needed to do an "internal exam" before putting in the speculum.  Heaps began touching C.D.'s legs and thighs, then touched her genital area, the opening of her vagina, and inserted his fingers.  While his fingers were inside of her, Heaps made sexual comments to C.D., including that she must "take good care" of herself because he could feel that her vagina was "very tight."  Heaps said that C.D.'s vagina was so tight he could tell that she was not having sex very often, and that her next boyfriend would be lucky to enjoy such a tight vagina.

56.     These statements stunned C.D.  She did not respond to them.  Heaps then completed the pap smear procedure and told C.D. she could get dressed.  Heaps and the female chaperone left the exam at the same time.  Although she was asked to (and did) disrobe from the waist up, Heaps did not conduct a breast exam during the appointment.

57.     While C.D. was shocked and embarrassed, she assumed as before that because Heaps was a UCLA doctor and there was a female chaperone in the exam room, Heaps had acted in accordance with medical norms.

58.     In June of 2018, Heaps conducted a procedure on C.D. known as LEEP, or Loop Electrosurgical Excision Procedure.  LEEP involves the use of a small electrical wire to remove abnormal cells from the cervix.

59.     After the procedure, C.D. was told that Heaps would review her lab results and that she would be contacted if any follow-up appointment was needed.

60.     A nurse called C.D. about a week after the procedure.  The nurse said that Heaps had determined that C.D. needed to undergo another LEEP, but that Heaps had retired and so she would need to find another doctor.

61.     C.D. asked the nurse why she had not been informed of Heaps's retirement before, as she had just seen him within the past couple of weeks.  The nurse responded only that the retirement was "very sudden."

62.     C.D. started seeing a female OB/GYN not affiliated with UCLA Health.

CLASS ACTION COMPLAINT

63.   C.D. asked UCLA Health multiple times for her medical records, but UCLA Health did not provide them.  After C.D.'s new doctor made the request directly to UCLA Health, it turned over C.D.'s records.

64.   C.D.'s new doctor determined that another LEEP was not necessary.

65.   C.D. feels deeply upset, demeaned, abused, and violated by Heaps.

66.   Heaps violated and injured C.D. by, among other things, (1) failing to advise and inform her of the procedures being performed, (2) touching her legs, thighs, genital area, and vagina without gloves, and placing his ungloved fingers inside her vagina, in a sexual manner, and (3) asking questions and making comments of a sexual nature without medical justification.

67.   Because Heaps was an employee of UCLA Health, C.D. reasonably believed that Heaps's conduct must have been legitimate medical treatment.

68.   In June 2019, C.D. received a letter from UCLA stating that Heaps was "charged with sexual battery and sexual exploitation in connection with his medical practice" and that the criminal charges against him were "very disturbing."

69.   After reading this letter, C.D. realized for the first time that Heaps's actions at her appointments were sexual assaults.  This realization has caused her to experience severe psychological and emotional distress.  She suffered and continues to suffer from shock, embarrassment, humiliation, and disgrace.  She also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

### 3.   E.F.

70.   Plaintiff E.F. started seeing Heaps for treatment in 2007 or 2008, at the UCLA Medical Plaza in Westwood.  Over the course of her visits with Heaps, E.F. noticed that he was becoming increasingly casual with her, to the point where it sometimes felt unprofessional.  Despite feeling unease, E.F. continued to keep Heaps as her doctor because of the difficulty of finding another OB/GYN with oncology expertise.

71.   In or around 2014, E.F. went to see Heaps for a regularly scheduled appointment.  Unlike previous visits, this time there was no female nurse present.

9

CLASS ACTION COMPLAINT

72.     Typically, when Heaps would conduct a breast exam of E.F., he would palpate around the breast and armpit first with her lying down, and then again with her sitting up.  At this appointment, he did the palpating while she was lying down, then asked her to sit up.  E.F. expected the process to repeat.  Instead, Heaps cupped his hands under both breasts at the same time and lifted them upwards.  As he was holding both breasts in his hands, he stared at E.F. and asked, "Are these real?"

73.     She turned her head away, feeling uncomfortable, awkward, and violated. Heaps kept his hands on her breasts, cupping and groping both at the same time in a sexual manner, and continued talking to E.F.  She was in disbelief and does not recall what Heaps was saying while he maintained the cupping and groping.  Heaps then smiled at her, moved his hands down the sides of her body to her waist, held his hands around her waist, and said, "you're fit, you're very fit."

74.     E.F. was shocked and confused by Heaps's behavior.  She was in disbelief and convinced herself that she was overreacting or misinterpreting what occurred.  E.F. continued to visit Heaps once or twice a year.

75.     A 2016 visit involved another incident of Heaps misconduct.  There was a female nurse in the room, positioned where the nurse did not have a view of what Heaps was doing.  Heaps then started to conduct a pelvic exam.  Previously, when Heaps conducted a pelvic exam, he put his fingers into E.F.'s vagina, and moved them along the vaginal wall while the other hand presses on the abdomen.  Heaps conducted the exam as he had before.  After that, however, he took his hand off her abdomen, and, keeping the fingers of his other hand inside of her, began a circular motion inside the vagina toward the front of her body in an apparent attempt to stimulate her "G-spot," while simultaneously rubbing her clitoris.  The touching was non-medical, and instead for the purpose of arousing her, or for his sexual gratification.

76.     E.F. was mortified.  She lifted herself from the exam table and stared down at Heaps.  He was looking at her and smiling.  She gave him a look of anger and disgust, and he quickly pulled his hands away from her genital area and ended the appointment.

CLASS ACTION COMPLAINT

After the appointment, E.F. ran to car, locked herself inside, and cried.  She never went back to see Heaps again.

77.    Heaps violated and injured E.F. by, among other things, making inappropriate sexual comments about E.F.'s body; fondling and cupping her breasts in a sexual manner under the guise of giving a breast exam; and touching her genitals in a sexual manner under the guise of giving a pelvic exam.

78.    In June 2019, E.F. received a letter from UCLA stating that Heaps was "charged with sexual battery and sexual exploitation in connection with his medical practice."  After reading this letter, E.F. realized for the first time that Heaps's actions at her appointments were sexual assaults.  This realization has caused her to experience severe psychological and emotional distress.  She suffered and continues to suffer from shock, embarrassment, humiliation, and disgrace.  She also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

**4.    G.H.**

79.    Plaintiff G.H. first saw Heaps in late 1997 when she was a student at UCLA School of Law.  Her visits with Heaps were at the UCLA student health center.

80.    G.H. and her husband had been trying to get pregnant, and in late 1997, G.H. tested positive on a home pregnancy test.  Shortly after, she went to see Heaps for her first prenatal exam.

81.    At the appointment, G.H. was wearing a paper hospital gown that opened in the front.  After a few questions about how G.H. was feeling in the early stages of a first pregnancy, he opened the gown very slowly, stared at G.H.'s naked body, reached his hands inside the gown, and placed his bare hands at the base of her neck.  From the base of her neck, he slowly moved his hands in a downward motion through the outer edges of her breasts and waist until he reached her hips, placing his hands on her hips.

82.    After several seconds, Heaps moved his ungloved hands slowly up G.H.'s torso, and touched her breasts one at a time.  Heaps did not palpate the breast area in the manner that G.H. would later understand—from seeing other physicians—to be a routine

CLASS ACTION COMPLAINT

breast exam.  Instead, Heaps was gently cupping and rubbing G.H.'s breasts, and continued to do so with both hands on one breast, then the other.  Heaps told G.H. it was too soon for her "milk to come in" but it was still important for him to feel her breasts during early pregnancy.  When Heaps eventually closed G.H.'s gown, he did so very slowly, and maintaining eye contact.  G.H. remembers thinking it was odd and unprofessional, almost as if Heaps was concluding a sexual encounter, rather than a medical exam.

83.    G.H. was confused and uncomfortable about her visit with Heaps and wondered whether he was getting sexual pleasure out of touching her and staring at her naked body.  She soon suppressed her suspicions, however, and rationalized that perhaps his prolonged touching and staring was somehow medically appropriate for a pregnant patient.

84.    On February 12, 1998, G.H. had a miscarriage that required emergency medical attention.  She spent several days in the intensive care unit at Olive View-UCLA Medical Center, in Sylmar, California, and was discharged on February 16, 1998.  Heaps was not involved in the care G.H. received for the miscarriage.

85.    In or around April 1998, G.H. became pregnant again and saw Heaps for her prenatal appointments at the student health center.

86.    During these appointments, Heaps would very slowly open G.H.'s gown, stare at her naked body, and cup and grope her breasts, often using both hands on one breast, then the other.  Heaps told G.H. that thorough breast exams were necessary during pregnancy, but that he would be very slow and gentle.  At the time, she felt awkward and uncomfortable.  In hindsight, G.H. observes that Heaps treated the exams almost as ceremonial or ritualistic—he seemed to relish removing her gown, viewing her in the nude, and touching her hips, waist and breasts in an intimate manner, without gloves.

87.    There was never a female nurse or chaperone present for any of G.H.'s appointments with Heaps.

CLASS ACTION COMPLAINT

88.     Because Heaps was an employee of UCLA Health, G.H. reasonably believed that Heaps's conduct must have been legitimate medical treatment.

89.     On July 25, 1998, G.H.'s second pregnancy also ended in a miscarriage that required emergency medical attention.

90.     G.H. did not continue seeing Heaps.  After graduation, when she became pregnant again, she decided to use another provider.

91.     Heaps violated and injured G.H. by, among other things, repeatedly touching her hips and waist and staring at her naked body in a sexual manner, and fondling and cupping her breasts in a sexual manner under the guise of giving a breast exam.

92.     On December 5, 2019, G.H. was watching the news and saw a telecast about Heaps being arrested for sex offenses.  G.H. was stunned.  She hit pause on the television, and memories of her appointments with Heaps returned.  She called her husband, saying simply, "I knew it, I knew it, I knew it"—at first unable to explain what had prompted her to call him.

93.     Upon seeing the telecast, G.H. realized for the first time that Heaps's actions at her appointments were sexual assaults.  This realization has caused her to experience severe psychological and emotional distress.  She suffered and continues to suffer from shock, embarrassment, humiliation, and disgrace.  G.H. also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

        **5.     I.J.**

94.     Plaintiff I.J. became a patient of Heaps in 2016, when she was diagnosed with uterine cancer.

95.     In her first post-surgery pelvic exam with Heaps, he inserted his fingers into her vagina and told her that she was "extremely tight" and that she should be stretching out her vagina with her own fingers at home.  I.J. assumed that this was legitimate medical advice to assist with her recovery.

13

CLASS ACTION COMPLAINT

96.     Heaps proceeded ask detailed questions about I.J.'s sexual experiences with her husband, including asking about the length and girth of his penis.  I.J. felt deeply uncomfortable but continued to believe that the questions had a medical purpose, especially because of Heaps's reputation as a highly skilled surgeon, and his position as a UCLA doctor.

97.     Heaps then told I.J. that she should be masturbating, including with a dildo and by massaging her clitoris.

98.     Plaintiff I.J. thought that Heaps was trying to elicit information about her sex life for his own gratification.  She feared, however, that if she confronted him, she would lose the critical cancer treatment he was supervising.  She tried to ignore or politely rebuff Heaps's sexual questions and comments.

99.     During a subsequent visit with Heaps, Plaintiff I.J. was undressed on the exam table with her feet in the stirrups.  Rather than performing a vaginal exam, as I.J. was anticipating, Heaps instead began rubbing her clitoris with his thumb.  After a few seconds, he asked her if she was stimulated.  I.J. was shocked and confused.  She felt an overwhelming sense of embarrassment, said "no," and turned her head away.  In the moment, Plaintiff I.J. was extremely sick from her cancer and lacked the physical and emotional strength to confront Heaps.  She believed that Heaps was the premier gynecological oncologist in Southern California and convinced herself that it was worth enduring his mistreatment if it meant overcoming her cancer.

100.    As a result of her experiences with Heaps, Plaintiff I.J. has suffered decreased appetite, weight loss, trouble sleeping, inability to focus on daily tasks, anxiety, depression, and obsessive-compulsive disorder.  She suffered and continues to suffer from shock, embarrassment, humiliation, and disgrace.  Plaintiff I.J. also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

//

//

CLASS ACTION COMPLAINT

### 6.     K.L.

101.    Plaintiff K.L. was an undergraduate at UCLA in 2001.  In or around November of that year, she saw Heaps at the student health center.

102.    Heaps instructed K.L. to undress, get on the exam table, and put her feet in the stirrups.  She did.  As she was lying there, waiting for the exam to begin, she leaned up and saw that Heaps was standing between her legs a few feet back, staring at her exposed pelvic area.  Heaps was silent.  Feeling uncomfortable, K.L. put her head back down and continued waiting.

103.    Suddenly and without warning, Plaintiff K.L felt Heaps's ungloved hand run up the inside of her right labia, and skim over her vaginal opening, like a "caress." K.L. believes that Heaps had put lubricant on his hand before touching her.

104.    K.L. was completely surprised by the way Heaps touched her.  She looked up and Heaps was staring at her. K.L. was shocked, and in the moment could not process what was happening.  She put her head back down and returned to staring at the ceiling.  Moments later, Heaps said that he was done with the exam and ended the appointment.

105.    On the bus ride home, Plaintiff K.L. felt uneasy and disgusted.  She was actively trying to suppress thoughts that she had been violated.  In previous OB/GYN appointments with UCLA providers, the examiner always wore gloves, verbalized in advance what the next action would be, and never touched her in a questionable or remotely sexual way.  The appointment with Heaps was fundamentally different than her previous experiences.  She believes Heaps touched her for his own sexual gratification, and also in an attempt to arouse her.

106.    At the time, and for many years after, Plaintiff felt too ashamed to tell anyone what happened, and thoughts of the event caused her severe emotional distress, including dissociation, and physical illness.  Since the experience with Heaps, Plaintiff has had difficulty forming trusting relationships with men, and has a heightened fear that men will become sexually aggressive with her, or otherwise engage in sexually predatory behaviors.

CLASS ACTION COMPLAINT

107.   Plaintiff K.L. suffered and continues to suffer from shock, embarrassment, humiliation, and disgrace.  She also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

### 7.   M.N.

108.   Plaintiff M.N. was patient of Heaps in late 1990s.  Heaps was part of a team of UCLA doctors assigned to facilitate M.N.'s donation of a kidneys.

109.   On approximately her third visit with Heaps, a nurse was initially present. M.N. was told that Heaps and the nurse would leave the room so she could get undressed and put on a paper gown.  Heaps left, but then quickly returned and shut the door.  M.N. assumed the nurse would return momentarily, but she did not.

110.   Heaps approached M.N. as she sat on the side on the exam table.  He opened the front of her gown and cupped his hands over both of M.N.'s breasts at the same time and began fondling them.  She felt uncomfortable and nervous, and turned her head to the side.  She then heard Heaps groaning and felt him move his hands to touch her nipples with his fingertips.

111.   The nurse returned to the room. Heaps pulled his hands away and asked M.N. to lay down.  The nurse was standing to M.N.'s side, where she did not have a direct view of M.N.'s pelvic area.

112.   Without any verbal warning, Heaps stuck his fingers into M.N.'s vagina and said, "oh, you're so tight."  Heaps made this comment slowly, with a breathy voice, as if trying to be sensual.

113.   The nurse shot a wide-eyed look at M.N.  M.N. stared back at the nurse. Neither spoke.  Heaps quickly removed his hands and got up to leave the room.

114.   M.N. does not believe that Heaps was wearing gloves during this visit.

115.   As a result of her experience with Heaps, Plaintiff M.N. became depressed. She blamed herself for Heaps's conduct and felt deeply ashamed.  She had previously been diagnosed with uterine fibroids, but was failing to manage them because she was regularly avoiding her appointments with Heaps.

CLASS ACTION COMPLAINT

116.   Eventually she found a different OB/GYN.  By that time, her fibroids had grown significantly.  She felt intense distress when she went to see her new doctor because it would trigger memories of Heaps.  M.N. went in for a scheduled myomectomy (surgical fibroid removal).  Depressed and overwhelmed with dread at the prospect of needing regular examinations to monitor the fibroids, M.N. asked the doctor to take out her uterus.

117.   M.N. went into therapy and into a three-year grief recovery program. She suffered and continues to suffer from severe psychological and emotional distress, regret, shock, embarrassment, humiliation, and disgrace.  M.N. also feels betrayed by and angry at UCLA for subjecting her and other women to Heaps's egregious behavior.

**B.      UCLA Was on Notice of Heaps's Misconduct**

118.   Heaps' affiliations with UCLA began in 1983.  He worked at the student health center in various capacities from 1983 to June 30, 2010.  In 1989, Heaps was appointed Assistant Professor in UCLA's Department of Obstetrics and Gynecology.

119.   In 1989, Heaps opened a private practice unaffiliated with UCLA Health. As of 2010, that practice was located at 100 UCLA Medical Plaza.  UCLA later acquired Heaps's practice, and Heaps saw patients at 100 UCLA Medical Plaza as an employee of UCLA Health from February 1, 2014, through June 28, 2018.

120.   In February 2014, Heaps was named to the position of Health Sciences Associate Clinical Professor in the Department of Obstetrics and Gynecology at the David Geffen School of Medicine at UCLA.  He held medical privileges at the Ronald Reagan UCLA Medical Center from 1986 to 2018.

121.   By the late 1980s, Heaps had already gained a reputation at UCLA for disturbing behavior with patients, including failing to put on gloves before touching their genital areas.

17

CLASS ACTION COMPLAINT

122. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

123. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████

124. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
████████████

125. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████

CLASS ACTION COMPLAINT



126.

127.

128.

129.

130.   In early 2014, a breast cancer patient informed UCLA Health that she was "completely shocked and embarrassed" by Heaps's inappropriate sexual contact and comments during a medical appointment, and that she had filed a complaint with the Medical Board of California.  UCLA later informed this woman that it had "thoroughly reviewed and investigated" her allegations.  In fact, UCLA never interviewed the patient in connection with her complaint.  UCLA also refused to provide further information, did not take responsibility for what had occurred, and failed to explain what, if anything, the university had done in response to her complaint.

131.   UCLA's refusal to inform this patient of the results of the investigation, if any, that it conducted into her 2014 complaint, violated its sexual misconduct policy.  That policy mandated that "the complainant shall be informed if there were findings made that the Policy was or was not violated and of actions taken to resolve the complaint, if any."

CLASS ACTION COMPLAINT

132. ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████

133. ████████████████████████████████
█████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
██████████

134. ████████████████████████████████
██████████

135. ████████████████████████████████
███████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████

136. ████████████████████████████████
██████████████████████████████
█████████████████████████████████
████████████████████████████████████
███████████████████

137. ████████████████████████████████
██████████████████████████████████

CLASS ACTION COMPLAINT



138.

139.

140.

141.   UCLA Health never informed the university's Title IX office of the 2014 complaint against Heaps or any of the other complaints prior to 2017.  The Title IX office only learned of the 2014 complaint, and of another complaint from 2015 against Heaps, in the course of a 2017 investigation into similar allegations of misconduct.

**C.     UCLA Did Not Respond Appropriately to Heaps's Misconduct**

142.   UCLA's failure to suspend or terminate Heaps after learning of his alleged abuse was part of a policy of deliberate indifference to reports of sexual misconduct

21

CLASS ACTION COMPLAINT

against physicians at UCLA Health.  This policy exposed numerous women, including Plaintiffs, to repeated instances of sexual abuse.

143.   Despite receiving complaints about Heaps's misconduct no later than 1999, UCLA did not remove Heaps from his position at UCLA's medical facilities and allowed him to continue seeing patients.

144.   Since 2006, if not earlier, the University of California has maintained a written policy on sexual harassment stating that it would respond "promptly and effectively" to reports of sexual harassment by preventing, correcting, and if necessary, disciplining individuals who engaged in, sexual harassment.

145.   UCLA's policy also permitted it to remove Heaps from campus once it began investigating his conduct in 2014.  Under UCLA's Investigatory Leave Policy, employees under investigation for "sexual violence," "sexual harassment," "exploitation, intimidation," or "harassment" may be placed on "investigatory leave" when "circumstances warrant removing an employee from the work site during the course of the University's investigation of allegations against the employee."

146.   Additionally, the Clery Act, 20 U.S.C. § 1092, requires UCLA to alert students and others on campus when an individual accused of sexual assault is determined to be a threat to the community.

147.   UCLA took no action to suspend, terminate, or otherwise protect patients from Heaps until 2018.

148.   Instead of placing Heaps on leave or warning the campus community while investigating his conduct in 2014, UCLA allowed him to continue seeing patients.

149.   UCLA's failure to act in 2014 to protect patients from Heaps exposed Plaintiffs and many other women to sexual harassment and assault at his hands.

150.   In addition to investigating allegations of Heaps's misbehavior as early as 2014, UCLA has admitted that it received further complaints about Heaps in 2015 and 2017.  UCLA did not publicly acknowledge the abuse allegations against Heaps until June 2019, when he was arrested and charged with sex crimes.

22

CLASS ACTION COMPLAINT

151.   Heaps reportedly earned more than $1 million each year between 2014 and 2018.

152.   In 2017, UCLA learned of additional allegations that Heaps engaged in inappropriate, medically unnecessary touching of, and made offensive comments to, a female patient.  UCLA again investigated—and again allowed Heaps to continue seeing patients during its investigation.  UCLA's failure to act in 2017 to protect patients from Heaps exposed many women to sexual harassment and assault at his hands.

153.   █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

154.   Another university investigation in early 2018 found that at least four patients had made serious allegations against Heaps.

155.   In March 2019, UCLA reached a $1.3 million settlement with one of its nurses, who alleged sexual harassment by Heaps.  At that point UCLA still had taken no action to suspend, terminate, or otherwise protect patients from Heaps, even after all the complaints about his improper conduct in the exam room.

156.   In April 2018, UCLA informed Heaps that it would not be reappointing him as a Health Sciences Clinical Professor after his appointment expired on June 30, 2018. On June 14, 2018, UCLA informed Heaps that he was being placed on investigatory leave.

157.   Not until June 2018—when similar allegations relating to Dr. George Tyndall's abuse of women at the University of Southern California became public—did UCLA notify the Medical Board of California about Heaps's misconduct.

158.   UCLA's inaction was consistent with its policy of deliberate indifference toward reports of sexual misconduct against its physicians.  Its own employees understood that UCLA would not hold its physicians accountable for sexual misconduct—not even when the misconduct was against an employee. ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████

159.   UCLA knew that the allegations against Heaps strongly suggested that his conduct—e.g., unexplained and excessive touching and manipulation of patients' breasts and genitalia—was not medically necessary and constituted sexual misconduct.

160.   A committee opinion of the American College of Obstetricians and Gynecologists (ACOG) regarding physician-patient sexual misconduct states: "Examinations should be performed with only the necessary amount of physical contact required to obtain data for diagnosis and treatment.  Appropriate explanation should accompany all examination procedures."  ACOG also warns physicians to "avoid sexual innuendo and sexually provocative remarks."  Additionally, "[p]hysicians aware of instances of sexual misconduct on the part of any health professional have an obligation to report such situations to appropriate authorities, such as institutional committee chairs, department chairs, peer review organizations, supervisors, or professional licensing boards."

161.   The ACOG opinion concludes by making clear that "[s]exual misconduct on the part of physicians is an abuse of professional power and a violation of patient trust.  It jeopardizes the well-being of patients and carries an immense potential for harm.  The ethical prohibition against physician sexual misconduct is ancient and forceful, and its application to contemporary medical practice is essential."

162.   Although UCLA was aware that Heaps's conduct could not be justified by medical necessity, it continued to allow Heaps to practice at its medical facilities,

CLASS ACTION COMPLAINT

1   thereby subjecting Plaintiffs and class members to a substantial risk of sexual

2   harassment or assault.

3       **D.    The Scale and Scope of Heaps's Abuse Emerges**

4       163.   In June 2018, UCLA notified law enforcement of Heaps's misconduct.

5       164.   On June 10, 2019, Heaps was arrested and charged with two counts of

6   sexual battery by fraud and one count of sexual exploitation of a patient.

7       165.   That same day UCLA publicly acknowledged that it had investigated Heaps

8   in 2018 "for sexual misconduct and improper billing practices."

9       166.   An editorial in the *Daily Bruin*, UCLA's student newspaper, noted that the

10  university "knew about Heaps's wrongdoings for more than a year, yet only broke its

11  silence when he was legally charged and arrested—leaving the campus community in

12  the dark." Instead of removing "Heaps from campus while he was under investigation,

13  which UC policy would have allowed," UCLA "let him continue to treat patients, who

14  were unaware their doctor was an alleged sex offender." UCLA thus "compromised its

15  students' and patients' safety, leaving them vulnerable to sexual violence" through its

16  inaction and silence "even after it had completed its investigation into Heaps and found

17  significant violations of UC sexual misconduct policies."

18      167.   UCLA issued an apologetic public statement the day Heaps was arrested:

19  "We are deeply sorry that a former member of our staff violated our policies and

20  standards, our trust, and the trust of his patients. . . . [W]e know we can and must do

21  better . . . ."

22      168.   UCLA also announced that it had hired a third-party firm, Praesidium, to

23  connect Heaps patients with support services. As of March 2, 2020, over a hundred

24  individuals had contacted Praesidium.

25      169.   In June 2019, UCLA Health sent a form letter to Heaps's former patients,

26  including Plaintiffs, disclosing his alleged misconduct. The letter states in part:

27          [W]e want you to be aware that Dr. James Heaps, an
            obstetrician-gynecologist employed at UCLA Health from
28

25

CLASS ACTION COMPLAINT

February 2014 to June 2018, has been charged with sexual battery and sexual exploitation in connection with his medical practices. The criminal charges filed against Dr. Heaps are very disturbing.

You are receiving this letter because our records indicate you are a patient who may have had had [sic] an appointment with Dr. James Heaps at UCLA Health at least once between February 2014 and June 2018.

170.   In the time since UCLA sent the June 2019 letter, an additional 51 women have filed suit against Heaps, and at least 50 others have come forward with allegations of sexual misconduct and abuse during women's health appointments with Heaps.

171.   A public records request in July 2019 revealed that UCLA had agreed to a confidential $2.25 million settlement with a former Heaps patient alleging sexual abuse. The *Daily Bruin* reported that UCLA wanted to "keep things confidential" to avoid a "blow up like what happened to USC" with the Tyndall controversy.

## AGENCY, ALTER EGO, AND CONSPIRACY ALLEGATIONS

172.   At all relevant times, Heaps was an employee, agent, and/or servant of the Regents, was under its complete control and active supervision, and operated within the scope of his employment by them.

173.   Defendants engaged in, joined in, and conspired with each of the other Defendants and wrongdoers in carrying out the tortious and unlawful activities herein described.  Each Defendant is legally responsible for the occurrences herein alleged, and Plaintiffs' damages, as herein alleged, were proximately caused by all Defendants.

174.   At all relevant times, there existed a unity of interest and ownership among Defendants such that any individuality or separateness between or among them ceased to exist.  Defendants and each of them were the alter egos of all of the other Defendants, in that they dominated and controlled each other without any separate identity, observation of formalities, or other manner of division.

175.   At all relevant times, each Defendant was the agent, representative, and/or employee of each of the other Defendants.  In engaging in the conduct herein alleged,

26

Defendants, and each of them, were acting within the course and scope of that alternative personality, capacity, identity, agency, representation, and/or employment and were within the scope of their authority, whether actual or apparent.

176. At all relevant times, each Defendant was the trustee, partner, servant, joint venturer, shareholder, contractor, and/or employee of each and every other Defendant, and the acts and omissions herein alleged were done by them through such capacity and within the scope of their authority, and with the permission and consent of each and every other Defendant. Such conduct was ratified by each and every other Defendant, and each of them is jointly and severally liable to Plaintiffs.

## TOLLING OF THE STATUTES OF LIMITATIONS

177. The statute of limitations for each of Plaintiffs' causes of actions was equitably tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

178. The UC Regents acted wrongfully by ignoring and actively concealing myriad complaints of sexual misconduct lodged against Heaps, and breached mandatory duties owed to Plaintiffs by continuing to employ Heaps and by failing to warn Plaintiffs of his propensity to harm and molest female patients.

179. The UC Regents received complaints of Heaps's sexually abusive conduct and knew of Heaps's dangerous propensity to sexually abuse his female patients, including vulnerable students, by 2014 at the latest. The UC Regents wrongfully concealed these complaints and suppressed its knowledge of Heaps's misconduct, including from the Medical Board of California's investigation, causing Plaintiffs and other female patients to suffer assault at the hands of Heaps, by holding him out as a trustworthy doctor and employing him as gynecologist and oncologist at university medical facilities.

180. The UC Regents benefited financially from retaining Heaps as an employee. By assigning and employing Heaps as a gynecologist and oncologist at university medical facilities, the UC Regents represented to UCLA students and patients,

and to the community at large, that Heaps was a safe and trustworthy doctor such that students and patients need not worry about Heaps interacting with and providing care to them.  The UC Regents did so to protect its own public image and so that it could retain past students, recruit new students, and gain and preserve sources of financial support.

181.   The UC Regents also benefited financially as the intended result of its active, wrongful concealment of Heaps's sexual abuse.  The UC Regents' deliberate concealment included allowing Heaps to quietly resign in June 2018 after an internal university investigation revealed that Heaps routinely fondled female patients' breasts and manipulated their genitalia for his own sexual gratification, made sexually offensive comments to them, and had been the subject of serious and credible complaints for many years.  The UC Regents allowed Heaps to resign without disclosing these findings in a deliberate attempt to conceal from Plaintiffs and the public that Heaps was a serial sexual predator, in order to insulate itself from liability and avoid reputational damage.  Similarly, the UC Regents settled multiple individual lawsuits brought by Heaps victims for the intended purpose of suppressing public awareness of his misbehavior to avoid reputational and financial harm.

182.   As part of Defendants' wrongful attempt to conceal Heaps's propensity to sexually abuse female patients and his past sexual abuse from public scrutiny and criminal investigation, Defendants implemented various measures with the intent and effect of making Heaps's conduct harder to detect and ensuring that other patients with whom he came into contact, including Plaintiffs, would be sexually abused and assaulted, including:

    a.    Permitting Heaps to remain in a position of authority and trust after Defendants knew he was assaulting his female patients;

    b.    Scheduling female patients for appointments with Heaps, including appointments without a nurse or chaperone present, despite knowing of his improper conduct;

      c.    Placing Heaps in a separate and secluded environment at the university medical center, and granting him unfettered access to and control over patients even when he was purporting to provide extremely sensitive gynecological and oncology treatment, thereby allowing Heaps to physically and sexually interact with female patients, including Plaintiffs;

      d.    Holding out Heaps to Plaintiffs, patients at UCLA medical facilities, UCLA students, UCLA alumni, and the public as a trustworthy person of good moral character who was capable and worthy of being granted unsupervised access to patients at UCLA health-care facilities;

      e.    Failing to disclose and actively concealing Heaps's prior record of misconduct, sexual abuse, harassment, and molestation, and his propensity to commit such acts towards female patients at university medical facilities, from UCLA's students, patients at its medical facilities, the public, and law enforcement;

      f.    Failing to investigate or otherwise confirm or deny such facts about Heaps, including prior complaints, claims, and investigations relating to sexual abuse suffered at his hands;

      g.    Failing to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Heaps, such as by avoiding placement of Heaps in functions or environments in which he would necessarily have intimate contact with female patients; and

      h.    Failing to implement systems or procedures to supervise or monitor doctors, chaperones, and other UCLA agents to ensure that they did not molest or abuse patients in Defendants' care and, further, that they report all reasonable suspicions of sexual assault or battery to law enforcement as mandated by Section 11160 of the California Penal Code.

    183.  By consequence of the threatening and frightening conduct of Heaps, Plaintiffs were coerced into not talking about the abusive acts they endured. Plaintiffs came forward only once the coercive nature of his acts subsided and became apparent to

CLASS ACTION COMPLAINT

them, due to UCLA's and the media's revelation of his pattern of misconduct and the subsequent police and prosecutorial action allowing such victims, including Plaintiffs, to come forward without fear of reprisal by Defendants.

184.   Defendants actively concealed numerous complaints of Heaps's sexually abusive behavior in order to deceive Plaintiffs into believing that his sexual abuse was a legitimate medical treatment.  Heaps's conduct in relation to Plaintiffs was intended to, and did, shame, humiliate, and embarrass Plaintiffs to their substantial psychological and emotional detriment, coercing them from disclosing the abuse to UCLA.  By his conduct and statements, Heaps falsely represented to Plaintiffs that his acts were for the proper purpose of conducting a vaginal examination, ultrasound, pap smear, and/or breast exam and that his acts conformed to accepted medical practice.  In reliance upon these representations and the fact that Heaps was a UCLA-employed doctor, Plaintiffs at all times trusted that Heaps had provided them with legitimate medical treatment.

185.   No Plaintiff has ever been a medical professional or had any specialized medical training, and hence Plaintiffs did not discover and could not have reasonably discovered their abuse at an earlier date than they did.  Plaintiffs were led to believe that Heaps's sexual abuse was not, in fact, sexual abuse, but rather was legitimate gynecological treatment because Heaps was employed at UCLA medical facilities.

186.   Only in June 2019, after Heaps was arrested and charged with criminal violations, and when his sexual mistreatment of female patients, including young female UCLA students, was nationally publicized in the media, did Plaintiffs come to learn that Heaps's treatment of them was not a legitimate medical treatment, but was instead sexual assault committed for his own gratification.

187.   Prior to the recent revelation of Heaps's conduct, Plaintiffs did not discover, and could not have reasonably discovered, UCLA's awareness and wrongful concealment of Heaps's pattern of abusive conduct.

188.   Plaintiffs were ignorant of the true facts related to their abuse until it was revealed in June 2019.  Not until June 2019, when Heaps was arrested and charged, and

CLASS ACTION COMPLAINT

when his sexual misconduct received national media attention and became public knowledge, did Plaintiffs know or have any reason to know of their claims against Defendants.  Not until then could Plaintiffs have reasonably discovered that UCLA had notice of Heaps's misconduct but failed to stop it.  Plaintiffs' claims therefore accrued in June 2019.

## CLASS ACTION ALLEGATIONS

189.  Plaintiffs bring this action under Federal Rule of Civil Procedure 23 on behalf of a class of all female patients of Dr. James Heaps who were seen for treatment by Dr. Heaps (1) at UCLA Medical Center (currently known as Ronald Reagan UCLA Medical Center) from January 1, 1986 to June 28, 2018, (2) at UCLA's student health center (currently known as Arthur Ashe Student Health and Wellness Center) from January 1, 1983 to June 30, 2010, or (3) at Dr. Heaps's medical offices at 100 UCLA Medical Plaza from February 1, 2014 to June 28, 2018.  Excluded from this class are counsel for Plaintiffs and their employees and immediate family members, and all judges assigned to this case and their staffs and immediate family members.  Plaintiffs reserve the right to amend the class definition, based on further investigation and discovery.

190.  The requirements of Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(4) are satisfied in this case.

191.  Numerosity (Fed. R. Civ. P. 23(a)(1)).  Joinder of the class members in a single litigation is not practicable.  There are several thousand individuals in the class.  Their identities can be readily determined from records in the UC Regents' possession.

192.  Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), (b)(3)).  Questions of law and fact common to class members predominate over any questions that may affect only individual class members.  Questions of law and fact common to the class include, without limitation:

       a.     Whether Heaps committed sexual assault and battery;

       b.     Whether Heaps violated the law during and within the scope of his employment at UCLA;

c.      Whether and when the UC Regents knew or reasonably should have known of Heaps's misconduct;

d.      Whether the UC Regents' actions and inaction in response to such knowledge were reasonably tailored to prevent foreseeable harm;

e.      Whether the UC Regents acted negligently, including with respect to training and supervising Heaps and preventing future injuries committed by him;

f.      Whether the UC Regents is legally responsible for Heaps's conduct under principles of respondeat superior or ratification; and

g.      Whether Defendants acted to suppress, minimize, and deter complaints about Heaps's predatory behavior.

193.   Typicality (Fed. R. Civ. P. 23(a)(3)).  Plaintiffs' claims are typical of the claims of the class.  The same legal doctrines and the same pattern and practice of sexual assault, battery, and harassment give rise to the claims of all class members.  All class members were unlawfully exposed to the same unsafe clinical setting.

194.   Adequacy of representation (Fed. R. Civ. P. 23(a)(4)).  Plaintiffs will fairly and adequately protect the interests of the class.  Plaintiffs have no interests antagonistic to the interests of other class members and are committed to vigorously prosecuting this action on their behalf.  Plaintiffs have retained counsel experienced in prosecuting class actions, including sexual assault class actions under California law.

195.   Superiority (Fed. R. Civ. P. 23(b)(3)).  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual class member's claim is small relative to the complexity of the litigation, and because of the UC Regents' financial resources, many class members are unlikely to pursue legal redress individually for the violations detailed in this complaint.  Classwide adjudication of common questions, such as the UC Regents' legal responsibility for Heaps's conduct, is superior to multiple individual actions and will conserve judicial and party resources while promoting consistency of adjudication.

CLASS ACTION COMPLAINT

196.   Common issues (Fed. R. Civ. P. 23(c)(4)).  Plaintiffs' claims, and the claims of all class members, are comprised of common issues that may be efficiently adjudicated in a single proceeding.

## FIRST CAUSE OF ACTION
### Violations of Title IX
### 20 U.S.C. § 1681(a), *et seq.*
### (Against the UC Regents)

197.   Plaintiffs incorporate the above allegations by reference.

198.   Under Title IX of the Education Amendments Act of 1972, "No person in the United States shall on the basis of sex, be . . . subject to discrimination under any education program or activity receiving Federal financial assistance . . . ."

199.   Plaintiffs are "persons" under Title IX.

200.   Plaintiffs were subjected to sexual abuse, harassment, and discrimination by Heaps's intentional conduct.

201.   The UC Regents receive federal financial assistance for educational activities relating to the practice of medicine at UCLA.  The conduct of those activities is therefore subject to Title IX.

202.   Title IX requires the UC Regents to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

203.   Heaps's conduct constitutes sexual harassment, abuse, and assault, and sex discrimination, in violation of Title IX.

204.   At all relevant times, the UC Regents exercised substantial control over Heaps.

205.   The UC Regents were on notice of Heaps's conduct alleged herein and had authority to institute corrective measures, but failed to investigate that conduct and take corrective action as required by Title IX.

206.   The UC Regents were deliberately indifferent to a substantial risk of sexual abuse to its students or patients in that the UC Regents had actual knowledge of Heaps's

33

CLASS ACTION COMPLAINT

misconduct, and responded unreasonably in failing to terminate his employment, publicize his misconduct, and remove him from a situation in which he could and would continue abusing patients, including Plaintiffs, at federally funded UCLA facilities.

207.   The UC Regents maintained a policy of deliberate indifference to reports of sexual misconduct against physicians at UCLA Health.  Despite possessing actual knowledge of Heaps's misconduct since no later than 1999, the UC Regents failed to investigate the complaints or to take any action to prevent Heaps from continuing to abuse and harass patients.  The UC Regents' policy of deliberate indifference to Heaps's misconduct created a heightened risk that Plaintiffs would be sexually assaulted or harassed at UCLA facilities.

208.   At all relevant times, the setting in which Heaps's sexual misconduct occurred—examinations at UCLA's medical centers and health clinics—was subject to the UC Regents' control.

209.   The UC Regents' failure to investigate Heaps's conduct and take corrective action, as required by Title IX, was a substantial factor in causing damage to Plaintiffs. As a direct and proximate result of the UC Regents' violations of Title IX, Plaintiffs suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Negligence and/or Gross Negligence**
**(Against the UC Regents)**

210.   Plaintiffs incorporate the above allegations by reference.

211.   Prior to Heaps's sexual molestation and harassment of Plaintiffs, the UC Regents knew or reasonably should have known of Heaps's propensity to molest and harass female patients during sensitive gynecological and oncology examinations.

212.   Prior to Heaps's sexual molestation and harassment of Plaintiffs, Heaps failed to follow protocol, including by groping female patients' breasts and manipulating

CLASS ACTION COMPLAINT

their genitalia in an apparent effort to sexually stimulate them, for his own sexual gratification.

213.   Prior to Heaps's sexual molestation and harassment of Plaintiffs, the UC Regents received a substantial volume of complaints from patients, nurses, and/or chaperones regarding Heaps's inappropriate behavior.

214.   Prior to Heaps's sexual molestation and harassment of Plaintiffs, the UC Regents learned that the Medical Board of California had opened an investigation into Heaps's conduct as a physician.

215.   Plaintiffs' care, welfare, and physical custody were entrusted to the UC Regents, and they voluntarily accepted the accompanying obligations.  The UC Regents owed Plaintiffs a special duty of care, particularly in the vulnerable context of a gynecological examination.  The UC Regents' duty to protect and warn arose from the special, confidential, and fiduciary relationship between Defendants and Plaintiffs.

216.   The UC Regents breached its duties of care to each Plaintiff by, among other things:

    a.   allowing Heaps to come into contact with her;

    b.   allowing Heaps to come into contact with her without effective supervision;

    c.   failing to prevent Heaps from committing wrongful sexual acts with medical patients, including Plaintiffs;

    d.   failing to appropriately train Heaps;

    e.   failing to appropriately monitor and supervise Heaps;

    f.   continuing to employ Heaps after reports of his improper conduct emerged and after the Medical Board of California began investigating his conduct as a physician;

    g.   failing to sufficiently investigate pervasive reports of sexual abuse by Heaps;

CLASS ACTION COMPLAINT

h.      failing to take necessary preventive and remedial actions in response to numerous complaints regarding Heaps;

i.      failing to implement systems or procedures reasonably geared to ensure female patients would not be abused at UCLA medical facilities;

j.       failing to disclose Heaps's propensity for sexual violation to Plaintiffs, the public, and law enforcement, or otherwise warn Plaintiffs and other potential victims of the significant risk of harm arising from that propensity;

k.      allowing Heaps to continue in a position of trust and authority, in which he could, and foreseeably would, do great damage to women, including vulnerable college students, even after being alerted as to his past wrongdoing;

l.      actively concealing from Plaintiffs, the public, and law enforcement that Heaps was sexually harassing and molesting patients; and

m.      holding Heaps out to Plaintiffs as being trustworthy and of good character.

217.   The UC Regents' breaches of its duties of care to Plaintiffs foreseeably harmed them and constitute gross negligence.

218.   The UC Regents' acts and omissions constitute an extreme departure from what reasonably careful university leaders would do in the same situation to prevent molestation and harassment of female patients under their care at university facilities. The UC Regents acted willfully, wantonly, and with conscious and reckless disregard for the rights and interests of Plaintiffs.  Its acts and omissions had a great probability of causing considerable harm and in fact did.

219.   As a direct and proximate result of the UC Regents' negligence set forth herein, Plaintiffs suffered severe emotional distress and are accordingly entitled to appropriate damages.  That many class members confronted actual or potential cancer diagnoses further magnified their suffering and stress resulting from the UC Regents' failure to prevent Heaps's foreseeable misconduct.

CLASS ACTION COMPLAINT

220.   A reasonable person in Plaintiffs' situation would be unable to adequately cope with the mental stress engendered by Heaps's abusive treatment of them, which was made possible by the UC Regents' negligence.  The UC Regents' negligence was a substantial factor in causing Plaintiffs to experience suffering at a level no reasonable person should have to endure.

221.   As a direct and proximate result of the UC Regents' negligence and gross negligence, Plaintiffs are entitled to damages, including punitive damages, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Violations of the Unruh Act
### Cal. Civ. Code § 51
### (Against the UC Regents)

222.   Plaintiffs incorporate the above allegations by reference.

223.   Plaintiffs had the rights to be free from gender discrimination, sexual molestation, abuse, and harassment under the Unruh Act.  The UC Regents violated these civil rights of Plaintiffs when it intentionally concealed from Plaintiffs complaints of sexual abuse, molestation, and harassment by Heaps and his investigation by the Medical Board of California.

224.   Defendants were acting under the color of their authority and in the scope of their employment, during the subject incidents, during which Plaintiffs were patients at UCLA medical facilities under the UC Regents' supervision and control.

225.   The UC Regents denied Plaintiffs full and equal accommodations, advantages, facilities, privileges and health-care services because of their gender, by allowing Heaps unfettered access to sexually abuse Plaintiffs, through his position of authority as a gynecologist specializing in oncology at UCLA, and by actively concealing from Plaintiffs that Heaps was engaged in serial sexual predation.

226.   By employing and retaining Heaps as a gynecologist specializing in oncology, despite knowing of numerous reports of Heaps's sexually abusive conduct,

CLASS ACTION COMPLAINT

and of the existence of an official Medical Board probe into that conduct, the UC Regents permitted and induced female patients to seek necessary medical treatment from Heaps, thereby exposing Plaintiffs to sexual abuse at his hands.

227.   Heaps made sexual advances and demands for sexual compliance of a hostile nature toward Plaintiffs, based on their gender, that were unwelcome, pervasive, and severe, including groping and fondling A.B., E.F., and G.H.'s breasts, attempting to sexually stimulate E.F.'s genital areas, and remarking on how "tight" C.D. was, under the supervision of the UC Regents, who was acting in the course and scope of its agency with Defendants and each of them.

228.   The UC Regents' retention of and failure to discipline Heaps denied Plaintiffs full and equal access to safe medical facilities, treatment, and services, on the basis of their gender.

229.   The substantial motivating reason for the UC Regents' active concealment of numerous complaints of Heaps's sexually abusive conduct was Plaintiffs' gender. The UC Regents knew that only female patients would seek gynecological and oncology treatment from Heaps and, thus, that only they would be subjected to his sexual assaults.

230.   As a direct and proximate result of the UC Regents' violations of the Unruh Act, Plaintiffs suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Sexual Assault**
**(Against Heaps)**

231.   Plaintiffs incorporate the above allegations by reference.

232.   Heaps, in subjecting Plaintiffs to sexual abuse and molestation, during the course and scope of his employment by the UC Regents, intended to and did cause a harmful and sexually offensive contact with their person and place them in imminent apprehension of such contact.

CLASS ACTION COMPLAINT

233.   During the aforementioned incidents, Plaintiffs suffered a harmful and offensive contact from Heaps, were placed in imminent apprehension of a harmful and sexually offensive contact by him, and believed that he had the ability to make a harmful and offensive contact with their person.

234.   At no point did any Plaintiff consent to Heaps's harmful or sexually offensive contact with her person, or to being placed by him in imminent apprehension of such contact.  Due to Heaps's age and position of authority, each Plaintiff's physical seclusion, and her mental and emotional state, Plaintiffs were unable to, did not, and could not consent to Heaps's acts.

235.   In doing the things herein alleged, Heaps violated Plaintiffs' right, under Section 43 of the California Criminal Code, of protection from bodily restraint or harm and from personal insult.  In doing the things herein alleged, Heaps violated his duty, under Section 1708 of the California Civil Code, to refrain from injuring the person of Plaintiffs and infringing their rights.

236.   As a direct and proximate result of Heaps's sexual assaults, Plaintiffs suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Sexual Battery
### Cal. Civ. Code § 1708.5
### (Against Heaps)

237.   Plaintiffs incorporate the above allegations by reference.

238.   During the course and scope of his employment with the UC Regents, Heaps intentionally, recklessly and wantonly committed acts which were intended to, and did, result in harmful and sexually offensive contact with intimate parts of Plaintiffs' person.

CLASS ACTION COMPLAINT

239.   Heaps committed the aforementioned acts with the intent to cause a harmful or sexually offensive contact with intimate parts of Plaintiffs' person.  These acts would offend a reasonable sense of personal dignity.

240.   At no point did any Plaintiff consent to Heaps's acts.  Due to Heaps's age and position of authority, each Plaintiff's physical seclusion, and her mental and emotional state, Plaintiffs were unable to, did not, and could not consent to Heaps's acts.

241.   As a direct and proximate result of Heaps's sexual batteries, Plaintiffs suffered harm, including shock, fright, distress, grief, and anguish, in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against All Defendants)

242.   Plaintiffs incorporate the above allegations by reference.

243.   Defendants' conduct toward Plaintiffs, as described herein, was outrageous and extreme.

244.   A reasonable person would not expect or tolerate the sexual harassment, molestation, and abuse of Plaintiffs by Heaps or the UC Regents' knowledge and callous indifference thereof.  Plaintiffs had great trust, faith, and confidence in Defendants, which, by reason of their wrongful conduct, turned to fear.

245.   A reasonable person would not expect or tolerate the UC Regents' retaining of Heaps in a position of care with respect to Plaintiffs and other patients.  At the time of the subject incidents, the UC Regents knew that Heaps had physically and sexually abused numerous female patients, including vulnerable college students.  The UC Regents' condoning of Heaps's misbehavior enabled him to have access to Plaintiffs and other patients, and resulted in his commission of wrongful sexual acts, including the conduct described herein, against female patients, including Plaintiffs.

246.   A reasonable person would not expect or tolerate the UC Regents and its agents to be unable to stop agents of the UC Regents, including Heaps, from committing

40

CLASS ACTION COMPLAINT

wrongful sexual acts with patients, including Plaintiffs, or to properly supervise, restrain, and discipline Heaps.

247.   Heaps's conduct described herein was intentional, malicious, and done for the purpose of causing, and with the substantial certainty that Plaintiffs would suffer, humiliation, mental anguish, and emotional and physical distress.

248.   The UC Regents acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress, knowing that Plaintiffs were patients at UCLA facilities at the time Heaps's pattern of wrongful and abusive conduct was ongoing.

249.   As a direct and proximate result of Defendants' intentional conduct set forth herein, Plaintiffs suffered severe emotional distress and are accordingly entitled to appropriate damages.  That many class members confronted actual or potential cancer diagnoses further magnified their suffering and stress resulting from his abhorrent behavior.

250.   A reasonable person in Plaintiffs' situation would be unable to adequately cope with the mental stress engendered by Heaps's abusive treatment of her. Defendants' conduct was a substantial factor in causing Plaintiffs to experience suffering at a level no reasonable person should have to endure.

## SEVENTH CAUSE OF ACTION
### Ratification
### (Against the UC Regents)

251.   Plaintiffs incorporate the above allegations by reference.

252.   Heaps was an agent and employee of the UC Regents between 1983 and 2018, during which time he continuously practiced medicine at UCLA facilities.

253.   At all relevant times, Heaps was acting, or purporting to act, as an agent of and on behalf of UCLA.

254.   During instances of Heaps's abuse of his patients, including of Plaintiffs, Heaps purported to act on behalf of the UC Regents.

CLASS ACTION COMPLAINT

255. The UC Regents learned of Heaps's pattern of unauthorized, improper actions and learned of the material facts associated with the relevant incidents at or close to the time they occurred.

256. The UC Regents ratified all acts and omissions described herein.  Many UCLA administrators and employees, including nurses and chaperones, knew that Heaps was molesting female patients and students under UCLA's and the UC Regents' care. They failed to take appropriate actions to stop him.  They actively concealed his transgressions.  The inaction of the UC Regents enabled the sexual abuse and assault of Plaintiffs and hundreds of women like them.

257. In failing to take corrective action to prevent further misconduct by Heaps, the UC Regents voluntarily retained pecuniary benefits accruing from Heaps's misconduct after it learned of it.

258. Imputing liability to the UC Regents advances the purposes of respondeat superior.  It would be unjust for the UC Regents to disclaim responsibility for injuries occurring during the course of Heaps's activities as a women's health doctor at UCLA's medical facilities.  Imputing liability to the UC Regents will prevent future harm and assure compensation to the victims.

259. The UC Regents bear legal responsibility for Heaps's wrongful acts. Plaintiffs are entitled to damages from the UC Regents in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the class, respectfully request that this Court:

A.    Certify the class under Federal Rule of Civil Procedure 23, appoint Plaintiffs as class representatives, and appoint their attorneys as class counsel;

B.    Enter judgment against Defendants and in favor of Plaintiffs and the class;

CLASS ACTION COMPLAINT

1    C.    Award appropriate compensatory and punitive damages to Plaintiffs
2   and the class;
3          D.    Award reasonable attorneys' fees and costs.
4                        **DEMAND FOR JURY TRIAL**
5          Under Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of
6   all issues so triable.
7
8   Dated: October 16, 2020                    Respectfully submitted,
9                                              By:  _____
10
11                                             Daniel C. Girard (State Bar No. 114826)
                                               Jordan Elias (State Bar No. 228731)
12                                             Trevor T. Tan (State Bar No. 281045)
                                               Makenna Cox (State Bar No. 326068)
13                                             **GIRARD SHARP LLP**
14                                             601 California Street, Suite 1400
                                               San Francisco, CA 94108
15                                             (415) 981-4800
16
17                                             Eric H. Gibbs (State Bar No. 178658)
                                               Amy M. Zeman (State Bar No. 273100)
18                                             Amanda M. Karl (State Bar No. 301088)
19                                             **GIBBS LAW GROUP LLP**
20                                             505 14th Street, Suite 1110
                                               Oakland, CA 94612
21                                             (510) 350-9700
22
23                                             Elizabeth A. Kramer (State Bar No. 293129)
                                               **ERICKSON KRAMER OSBORNE LLP**
24                                             182 Howard Street
25                                             San Francisco, CA 94105
                                               Telephone: (415) 635-0631
26                                             Facsimile: (415) 599-8088
27                                             Elizabeth@eko.law
28

                                        43

*Counsel for Plaintiffs*

CLASS ACTION COMPLAINT