Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Trevor T. Tan (State Bar No. 281045)
Makenna Cox (State Bar No. 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dgirard@girardsharp.com
jelias@girardsharp.com
ttan@girardsharp.com
mcox@girardsharp.com

Eric H. Gibbs (State Bar No. 178658)
Amy M. Zeman (State Bar No. 273100)
Amanda M. Karl (State Bar No. 301088)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com
amk@classlawgroup.com

Elizabeth A. Kramer (State Bar No. 293129)
**ERICKSON KRAMER OSBORNE LLP**
182 Howard Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088
elizabeth@eko.law

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.B., C.D., E.F., G.H., I.J., K.L., M.N., on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JAMES MASON HEAPS,<br><br>          Defendants. | Case No. 2:20-CV-09555-RGK (Ex)<br><br>Hon. R. Gary Klausner<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY SETTLEMENT APPROVAL**<br><br>Date: December 21, 2020<br>Time: 9:00 A.M.<br>Courtroom: 850, 8th Floor |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ..........................................2

    I.    Allegations of Predatory Behavior Against Dr. James Heaps ...................2

           A.    Plaintiff A.B.'s Experience ...........................................................3

           B.    Plaintiff C.D.'s Experience ...........................................................4

           C.    Plaintiff E.F.'s Experience ............................................................4

           D.    Plaintiff G.H.'s Experience ...........................................................4

    II.    UCLA's Alleged Role in Failing to Stop Heaps's Sexual Misconduct.....5

    III.    Litigation History ....................................................................................6

THE SETTLEMENT .............................................................................................8

    I.    The Settlement Class ...............................................................................8

    II.    The Settlement Fund ...............................................................................9

           A.    Tier 1 Awards - $2,500 Minimum to Each Class Member..............9

           B.    Tier 2 Awards - $12,500 Through Written Claims Process ............9

           C.    Tier 3 Awards - $12,500 to $250,000 Through Written Claims & Interview ....................................................................................10

           D.    Set-Aside for Supplemental Awards - $5 Million ........................10

           E.    Pro Rata Adjustment to Awards ..................................................11

           F.    Residual Distributions................................................................11

    III.    Equitable Relief.....................................................................................11

    IV.    Notice & Claims Administration ...........................................................13

    V.    Attorneys' Fees, Costs, and Services Awards.........................................13

1

VI.   Released Claims ........................................................................14

LEGAL ANALYSIS ...........................................................................14

    I.   The Settlement Is Likely to Merit Final Approval.................................15

        A.   Plaintiffs and Their Counsel Have Adequately Represented the Class ............................................................................15

        B.   The Proposed Settlement Was Negotiated At Arm's Length........16

        C.   The Relief Provided for the Class is Adequate............................16

        D.   The Proposed Settlement Treats Class Members Equitably..........19

    II.   The Settlement Class Is Likely To Be Certified .....................................20

        A.   The Class Meets the Requirements of Rule 23(a) .........................20

        B.   The Class Meets the Requirements of Rule 23(b)(3) ...................22

    III.   The Proposed Notice Plan Meets All Applicable Requirements.............23

        A.   The Notice Plan Uses The Best Practicable Means To Reach  Class Members......................................................................23

        B.   The Proposed Notice Adequately Informs Class Members of their Rights and Options Under the Settlement.....................................23

        C.   The Proposed Settlement Administrator Is Qualified and Experienced...................................................................24

    IV.   Schedule ...................................................................................24

CONCLUSION ......................................................................................25

2

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001)...............................................................21

*Doe v. Roman Catholic Diocese of Covington*,
  No. 03-CI-00181, 2006 WL 250694 (Ky. Cir. Ct. Jan. 31, 2006) ............................18

*Jane Doe 30's Mother v. Bradley*,
  64 A.3d 379 (Del. Super. Ct. 2012) .......................................................18

*Karasek v. Regents of Univ. of California*,
  956 F.3d 1093 (9th Cir. 2020)...........................................................22

*Lecenat v. Perlitz*,
  No. 3:13-CV-01633-RNC, 2019 WL 3451571 (D. Conn. Feb. 11, 2019) ................21

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998)...........................................................15

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014)............................................................21

*Potter v. Big Tex Trailer Mfg.*, Inc.,
  No. 18-cv-1678-PSG, 2019 WL 8512459 (C.D. Cal. Sept. 26, 2019).................16, 17

*Rapuano v. Trs. of Dartmouth College*,
  2020 WL 475630 (D.N.H. Jan. 29, 2020).............................................20, 21, 23

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003)............................................................21

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) .................................................................22

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016)............................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................20

**Rules**

Fed. R. Civ. P. 23 ...................................................................*passim*

**Other Authorities**

*Newberg on Class Actions* § 13:1 (5th ed.) ...............................................14

i

**INTRODUCTION**

Plaintiffs in this case are seven former patients of Dr. James Heaps, a physician formerly affiliated with UCLA Medical, who was arrested and charged with multiple counts of sexual battery in June 2019. Plaintiffs filed this lawsuit against Heaps and UCLA—the university that employed Heaps as an OB/GYN, alleging UCLA missed multiple opportunities to stop him from sexually exploiting his patients. Plaintiffs sued to obtain compensation for themselves and over 5,000 patients who saw Heaps at UCLA facilities during specified time periods between 1983 and 2018. With the assistance of mediator Ken Feinberg, the parties have reached a settlement that will require UCLA to make institutional reforms and provide a $73 million fund to compensate class members. Notice, claims administration, and attorneys' fees will be paid separately by UCLA and will not reduce settlement benefits.

The parties propose to distribute the settlement using a tiered process that will award class members between $2,500 and $250,000, and potentially more in exceptional cases. An initial Tier 1 payment of $2,500 will be automatically mailed to all class members who can be identified from UCLA's patient records (others who weren't identified can submit a Statement of Class Membership to receive their Tier 1 payment). Those class members who wish to seek additional compensation can do so through a trauma-informed claims process that Plaintiffs propose be administered by Judge Irma Gonzalez (Ret.)., the same Court-appointed Special Master who is completing a similar process in the *USC Student Health Center Litigation*. The Special Master will be assisted by a trained team and will head the panel of experts charged with approving claims and allocating awards.

In addition to the automatic $2,500 payment, class members can also obtain an additional $10,000 Tier 2 payment (for a total of $12,500) by submitting a written claim that the panel deems a credible account of behavior that fell outside the scope of accepted medical standards. Or class members can apply for a Tier 3 payment, which will range in total from $12,500 to $250,000, as determined by the Special Master, by

1

answering additional written questions and giving an interview to the Special Master or a member of her team. The Special Master will also be authorized to supplement its Tier 3 award with additional compensation in extraordinary cases; $5 million of the fund has been set aside for these supplemental awards.

Plaintiffs believe the proposed settlement to be in the best interests of class members and ask that the Court grant it preliminary approval. A class settlement offers several benefits in cases of widespread sexual misconduct, but perhaps the greatest is that it compensates victims who otherwise would not have come forward to seek relief from the courts—through a discrete, confidential process designed to avoid re-traumatization. Class members who wish to pursue individual litigation remain free to choose that route instead. But too many victims will be left behind without more. Litigation can be invasive, emotionally trying, and ultimately traumatizing for victims of sexual harassment or sexual violence. The proposed settlement offers a better alternative for thousands of women who were impacted by Heaps's predatory behavior and would otherwise receive nothing.

## BACKGROUND AND PROCEDURAL HISTORY

### I. Allegations of Predatory Behavior Against Dr. James Heaps

Following his arrest on charges of sexually abusing two of his patients, many women have come forward to report sexual misconduct that occurred while Heaps was seeing patients as an OB/GYN at UCLA's medical facilities between 1983 and 2018. The allegations concerning Heaps's examinations include:

- making inappropriate and sexually suggestive comments about patients' appearance, anatomy, or sexual activity
- removing patients' clothing or gowns in a sensual manner, without consent, and while staring intently or making excessive eye contact
- cupping, fondling, and jiggling patients' breasts, making moaning noises, and stimulating patients' nipples during breast exams, often without using gloves and with patients who did not need a breast exam

2

- rubbing patients' clitorises, attempting to stimulate their G-spots, and digitally penetrating patients' vaginas with his fingers, often without using gloves, during pelvic exams
- simulating intercourse with an ultrasound probe, often roughly, at length, and while staring at the patient instead of the ultrasound monitor
- recommending unnecessary procedures and overly frequent examinations to create additional opportunities for abuse

Examples of Plaintiffs' experiences illustrate the pattern of allegations against Heaps:

### A.     Plaintiff A.B.'s Experience

Plaintiff A.B. alleges that at an appointment in 2014, Heaps told her she needed a transvaginal ultrasound—even though A.B. was only scheduled for a pap smear and did not have any of the symptoms or medical conditions that might require a transvaginal ultrasound. During the proceeding, Heaps aggressively and repeatedly thrust the ultrasound probe deep into A.B.'s vaginal canal for more than fifteen minutes, causing A.B. severe pain. (Complaint, Dkt. No. 1, ¶ 26.) Heaps didn't rotate the probe or move it to different areas, as one would when performing a legitimate medical procedure, and he didn't look at the video display screen—he stared at A.B.'s face the entire time. (*Id.* ¶¶ 24-25.) Neither Heaps nor anyone else at UCLA Health ever contacted A.B. to report the results of the ultrasound, but Heaps did have A.B. return for another pap smear later that year. This time, Heaps told A.B. she also needed a breast exam. But instead of palpating specific areas of each breast, as A.B. had experienced during other breast exams, Heaps fondled, cupped, and jiggled her breasts—all the while staring at A.B. and saying nothing. A.B. was shocked and unable to move or speak while this was happening to her. Only when she was able to gather the strength to turn towards Heaps and make eye contact did he pull his hand away. (*Id.* ¶¶ 28, 32-33.)

3

### B.    Plaintiff C.D.'s Experience

Plaintiff C.D. alleges that when she went to see Dr. Heaps for her regularly scheduled pap smear in 2015, Heaps began asking inappropriate questions about C.D's sex life as he was examining her. Without using gloves, Heaps began touching C.D.'s legs and thighs, her genital area, and the opening of her vagina. He then used his fingers to penetrate her in a sexual manner, either for his own gratification or in an attempt to stimulate her—all without wearing gloves, while staring at C.D., and while continuing to ask about C.D.'s sex life. (Complaint ¶¶ 46-48.) At her next appointment, Heaps again caressed and digitally penetrated C.D.. (*Id*. ¶ 55) As he did, Heaps commented that he could tell C.D. had not been having sex frequently, that a pretty girl like her should have regular sex, and that her next boyfriend would be lucky to enjoy such a tight vagina. (*Id.*)

### C.    Plaintiff E.F.'s Experience

Plaintiff E.F. alleges that she had been seeing Dr. Heaps on a regular basis for several years when his behavior shifted from overly casual and at times unprofessional to sexual abuse. At a 2014 appointment, Heaps cupped his hands under both of E.F's breasts, lifted them aloft, and asked, "Are these real?" Heaps then ran his hands along E.F.'s body, stopping at her waist, and while holding them there, told E.F. she was really fit and in great shape for her age. At an ensuing appointment, Heaps was conducting a routine pelvic exam when he suddenly began to stimulate her G-spot while also rubbing her clitoris. When E.F. shifted her body and looked up at Heaps in disgust, Heaps smirked at her, withdrew his fingers and walked out of the room. (*Id.* ¶¶ 70-78.)

### D.    Plaintiff G.H.'s Experience

Plaintiff G.H. was an employee of UCLA Health who first went to see Dr. Heaps for a prenatal exam in late 1997. She alleges that without first announcing what he was doing or obtaining G.H.'s consent, Heaps slowly opened G.H's hospital gown and stared at her naked body. He then reached inside the gown and slowly moved his bare hands along the outside of G.H.'s body, along the outer edges of her breasts, along the outside of her waist, and down to her hips. After several seconds, Heaps slowly moved his hands

4

back up G.H.'s torso and began gently cupping and rubbing G.H.'s breasts, with both hands on one breast, and then on the other. When Heaps eventually closed G.H.'s gown, he did so very slowly while maintaining eye contact. Several months later, after suffering through a miscarriage that required her to spend several days in the intensive care unit, G.H. became pregnant again. She again visited Dr. Heaps's office for prenatal exams. Each time, Heaps slowly removed G.H.'s gown, staring at her naked body, and slowly moved his hands along her hips, waist, and breasts. (*Id.* ¶¶ 79-93.)

The allegations of the remaining class representatives are similar. (*Id.* ¶¶ 94-117.)

## II. UCLA's Alleged Role in Failing to Stop Heaps's Sexual Misconduct

Heaps began seeing patients on a part-time basis at UCLA student health center in 1983, while completing his internship, residency, and fellowship at the UCLA School of Medicine. Plaintiffs allege that by the late 1980s, Heaps had already gained a reputation within UCLA for exhibiting disturbing behavior with patients. When one of Heaps's patients mentioned him to another doctor at UCLA, she was told flatly, "Never see him. Never." And when another of Heaps's patients told a friend who worked at UCLA that she'd just had an uncomfortable encounter with her gynecologist, the friend replied, "Oh, was it Jamie Heaps?"

In 1989, UCLA appointed Heaps as an Assistant Professor in its Department of Obstetrics and Gynecology. For the next 25 years, he would continue to serve on the faculty of the UCLA School of Medicine. Between 1989 and 2014, Heaps maintained a private practice independent of the university, but he continued to see patients periodically at the UCLA student health center and maintained hospital privileges at the UCLA Medical Center.

Heaps's interactions with patients led to allegations of inappropriate conduct. One patient recounted how, in December 1999, Heaps had asked her a series of invasive and inappropriate personal questions before suggesting she visit an adult shop like the Pleasure Chest on Santa Monica Boulevard, purchase a dildo, and insert the dildo into her vagina for thirty minutes each day. The patient further reported that Heaps's physical

5

examination differed markedly from what she'd come to expect from OB-GYNs, that she found "Heaps' examination of the vagina to be particularly rough, unnecessarily painful and violating," and that she was "in almost constant pain for two days after his examination." Another patient reported in 2004 that Heaps had rubbed her clitoris, smelled her vagina, and told her she smelled nice. And yet another patient reported in 2013 that Heaps fondled her breasts while breathing heavily on her neck before moving his hands to her stomach. The patient believed he was about to orgasm.

In February 2014, Heaps was hired as a full-time employee of UCLA Health. Complaints about Heaps's behavior continued. One breast cancer patient told UCLA Health that she was "completely shocked and embarrassed" by Heaps's inappropriate sexual contact and comments during her medical appointment, and filed a complaint with the Medical Board of California. Another patient, who also worked at UCLA Health, reported that Heaps had violated her during a 2016 appointment, but was told to "let it go because Dr. Heaps was a physician and she was a nurse and it would cause problems for her." (Complaint ¶ 158.)

It was not until late 2017 that allegations of sexual misconduct by Heaps were finally reported to UCLA's Title IX office and a formal investigation opened. Heaps was nonetheless allowed to continue seeing patients—both during the investigation and after UCLA informed Heaps that his contract would not be renewed when it expired on June 30, 2018. Only after an *LA Times* article excoriated USC for similarly allowing Dr. George Tyndall to continue treating patients despite years of sexual misconduct allegations did UCLA finally stop Heaps from seeing patients, effective June 14, 2018, and notify law enforcement of the allegations against Heaps.

### III.  Litigation History

Plaintiffs filed suit against Heaps and UCLA in July 2019, seeking to represent a class of all women examined by Heaps at UCLA facilities from 2014 to 2018. *A.B. v. Regents of Univ. of Cal.*, Case No. 2:18-cv-06586, Dkt. No. 1. In response to Plaintiffs' discovery requests, UCLA produced over 5,500 pages of documents, including Heaps's

6

personnel file, the results of UCLA's recent investigations into Heaps's conduct, and the University's policies and procedures regarding sexual harassment and sexual violence. (Joint Decl. ¶¶ 4-5.) In addition, UCLA produced anonymized records of calls from former Heaps patients to Praesidium, an abuse-prevention organization that UCLA hired to counsel victims after Heaps was arrested. (*Id.* ¶ 5.)

Based on their review of UCLA's records and interviews with over twenty of Heaps's victims, Plaintiffs sought leave to file an amended complaint that expanded the proposed class to include all women examined by Heaps at UCLA facilities from 1983 to 2018. (*See A.B. v. Regents of Univ. of Cal.*, Dkt. Nos. 34 & 35-2.) Plaintiffs alleged claims for sexual assault, sexual battery, and intentional infliction of emotional distress against Heaps; and claims against UCLA for gender discrimination under Title IX and the Unruh Act, negligence, intentional infliction of emotional distress, and ratification of Heaps's conduct. (*Id.* Dkt. No. 35-2 ¶¶ 169-231.)

Plaintiffs had travelled to Los Angeles to depose UCLA's representatives when COVID-19 restrictions required the depositions to be cancelled at the last moment. Magistrate Judge Eick thereafter granted UCLA's request for a stay of discovery in light of the COVID-19 pandemic and the public health responsibilities that UCLA's witnesses would be facing in the coming weeks and months. (Joint Decl. ¶ 8.) Plaintiffs requested that their deadline to move for class certification likewise be stayed, but after that request was denied, the parties negotiated an agreement for Plaintiffs to dismiss without prejudice and refile in a few months—after the parties and the judicial system had adjusted to the effects of the pandemic. (*Id.* ¶¶ 9-11) The parties agreed to work toward a mediation in the meantime, and informally exchanged information to facilitate that effort. (*Id.* ¶¶ 11-13.)

In late May 2020, the parties spent two days in mediation with Ken Feinberg and his colleague Camille Biros, who have helped resolve several high-profile sexual abuse cases. (*Id.* ¶ 21.) At the end of the second day of the mediation, Plaintiffs and UCLA reached an agreement in principle to resolve the litigation. (*Id.* ¶ 23.) In the months that

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

followed, the parties prepared settlement documents, obtained formal approval from the UC Board of Regents, and ultimately executed the Settlement Agreement now before the Court. (*Id.* ¶¶ 24-25.)

**THE SETTLEMENT**

**I.    The Settlement Class**

The parties' settlement will, if approved by the Court, offer relief to the following class:

> All female patients of Dr. James Heaps who were seen for treatment by Dr. Heaps (1) at UCLA Medical Center (currently known as Ronald Reagan UCLA Medical Center) from 1986 to June 28, 2018, (2) at UCLA's student health center (currently known as Arthur Ashe Student Health and Wellness Center) from 1983 to June 30, 2010, or (3) at Dr. Heaps's medical offices at 100 UCLA Medical Plaza from February 1, 2014 to June 28, 2018.

The class consists of an estimated 6,600 women: UCLA has identified approximately 5,000 class members from patient records and estimates there may be as many as 1,600 additional class members for whom records no longer exist. (Settlement, Joint Decl. Ex. 1, ¶ 10.6.)

Plaintiffs had previously sought to represent a class consisting of "women who were examined by James Heaps, M.D.[,] at UCLA facilities after January 1, 1983." (*A.B. v. Regents of Univ. of Cal.*, Dkt. No. 34-1 ¶ 161.) The settlement class definition is substantively the same but adds specifics about the various time periods in which Heaps treated patients at UCLA medical facilities (as opposed to treating them in his private practice) to aid women in identifying themselves as class members.

Patients who saw Heaps exclusively at his private medical offices before February 1, 2014, are not included in the class. But when UCLA hired Heaps as a full-time employee on February 1, 2014, and absorbed his private practice, those offices effectively became UCLA facilities. Patients who saw Heaps at his medical offices from February 1, 2014, to June 28, 2018, are therefore included in the class.

8

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

## II.     The Settlement Fund

The settlement requires UCLA to create a $73-million, non-reversionary settlement fund that will be used solely to pay class members. (Settlement ¶¶ 4.4, 9.1.) All class members are eligible for an initial $2,500 Tier 1 award and most class members will receive that award automatically—no action required. Additional Tier 2, Tier 3, and supplemental awards are also available to class members who come forward and describe their experience. The amount of those awards will generally range from $12,500 to $250,000, and will be awarded based on an expert panel's review of the class member's experience.

### A.     Tier 1 Awards - $2,500 Minimum to Each Class Member

Ten days after the settlement takes effect, UCLA will mail a $2,500 check to every class member who can be identified from its patient records. (Settlement Ex. A at 2.) These class members will be notified of the settlement by direct mail and informed that they will not need to do anything to receive this initial Tier 1 award, and that they can apply for an additional award as well. (*Id.*)

Class members who are not identified from UCLA's patient records, and who learn of the settlement through published notice or other means, can also obtain a Tier 1 award by submitting a Statement of Class Membership. (*Id.*; Settlement Ex. C1) The Statement of Class Membership is a simple form attesting that the class member visited Dr. Heaps at the UCLA Medical Center, UCLA student health center, or Dr. Heaps's offices at 100 UCLA Medical Plaza during the specified class period, and can be submitted by mail or through the settlement website. (Settlement Ex. C1.) All class members who submit a valid Statement of Class Membership will be mailed a check for $2,500 within 10 days of the settlement's Effective Date. (Settlement Ex. A at 2.)

### B.     Tier 2 Awards - $12,500 Through Written Claims Process

All class members will also have the option of applying for an additional Tier 2 or Tier 3 award by submitting a Claim Form. (*Id.* at 1.) To apply for a Tier 2 award, class members will be asked to answer several written questions about their experience with

9

Dr. Heaps. (*Id.* at 2-3; Settlement Ex. C2.) An expert panel will review these claims and will award an additional $10,000 (for a total Tier 2 award of $12,500) so long as it finds the Claim Form is credible and that the conduct described fell outside the scope of accepted medical standards of care. (Settlement Ex. A at 2-3.)

The Panel will be comprised of a Special Master experienced in handling sexual abuse claims; a forensic psychologist or psychiatrist; and an OB/GYN. (Settlement ¶ 2.28.) The Special Master will be also be authorized to retain experts to assist her in evaluating Claim Forms, and if needed, the Special Master's Team may contact Tier 2 claimants in writing about their Claim Form to aid the Panel in reaching a determination. (Settlement ¶ 2.39 & Ex. A at 2-3.)

## C.  Tier 3 Awards - $12,500 to $250,000 Through Written Claims & Interview

Class members who apply for Tier 3 awards will be asked to answer additional written questions; to submit any supporting documentation they may have to support their claims, such as contemporaneous accounts of their experience with Heaps or medical expenses incurred as a result of their experience with Heaps; and to give a confidential interview to the Special Master or her team. (Settlement Ex. A at 3 & Ex. C2.) The interviewer will provide an assessment to the Panel, and so long as the Panel finds the information submitted credible and that Heaps's conduct fell outside the scope of accepted medical standards of care, it will authorize a Tier 3 award. The amount of each Tier 3 award will range from an additional $10,000 (or $12,500 in total) to an additional $247,500 (or $250,000 in total), and will be determined by the Panel based on its assessment of the emotional distress and/or bodily injury suffered by the claimant. (Settlement Ex. A at 3.)

## D.  Set-Aside for Supplemental Awards - $5 Million

Up to five million dollars of the settlement fund will be set aside to supplement Tier 3 awards in extraordinary cases. Based on its consideration of all evidence submitted by a Tier 3 claimant, the Panel will be authorized to make a supplemental

award if it determines that $250,000 is inadequate compensation. (*Id.* at 4.) The Panel may recommend a supplemental award of any amount, so long as the total amount of all supplemental awards does not exceed $5 million. (*Id.*) Any unused portion of the set-aside will be available for distribution to class members.

### E.    Pro Rata Adjustment to Awards

If the awards to Tier 2 and Tier 3 claimants do not exhaust the settlement fund, all Tier 2 and Tier 3 awards will be increased on a pro rata basis until the settlement fund is exhausted or until all Tier 2 and Tier 3 awards have been increased by 50%. If the settlement fund is still not exhausted, the remaining balance will be distributed equally among all class members (unless those distributions would be less than $100, in which case the balance will be added to the Tier 2 and Tier 3 awards on a pro rata basis). (*Id.* at 4-5.)

If the awards to Tier 2 and Tier 3 claimants exceed the balance remaining in the settlement fund, Tier 2 and Tier 3 awards will instead be decreased on a pro rata basis. (*Id.* at 5.) The $2,500 Tier 1 payments will not be decreased.

### F.    Residual Distributions

If the settlement fund is not fully disbursed after the claims process is completed, the parties will notify the Court and propose additional means to distribute the residue. There will be no *cy pres* distribution unless the Court finds the parties have in good faith exhausted all reasonable efforts to distribute the settlement fund to class members. (Settlement ¶ 6.7.)

## III.    Equitable Relief

The Settlement also requires UCLA to implement new procedures to prevent sexual misconduct at its medical facilities, including:

**New Investigation Model**: UCLA medical facilities will implement a new model for investigating alleged sexual harassment, including alleged sexual assault, arising in the patient care context. The new model will include the development of a formal

Incident Response Plan and a trained Incident Response Team that will be empowered to take action in response to allegations of sexual misconduct.

**Formal Chaperone Policy**: UCLA will implement policies requiring that a trained chaperone be present during a physical examination of a patients' breasts, genitals, or rectum. Chaperones will report through central health system administration, not to the physicians whose exams and procedures they chaperone.

**Boundaries Training**: No later than July 2021, UCLA medical facilities will require that all physicians complete and pass an in-person or online boundaries training course within six months after a credentialing or recredentialing application is approved. In addition, all physicians who perform sensitive examinations will be required to complete a suitable boundaries training course reflecting best practices.

**Patient Reporting Options**: UCLA will inform patients how to report sexual misconduct to UCLA or to appropriate government agencies through plain-language notices displayed at its medical facilities and on those facilities' websites.

**Credentialing and Recredentialing Applications**: When credentialing or recredentialing medical staff, UCLA will inquire whether any allegation of sexual misconduct has been substantiated against the applicant through a formal investigation or whether the applicant has been subject to adverse action relating to an allegation of sexual misconduct.

**Compliance Monitoring**: The University of California has designated a Compliance Monitor to facilitate, oversee, and independently evaluate UCLA's implementation of its new procedures, and UCLA will describe its progress in annual reports sent to the Chancellor, the UC Regents, and Class Counsel.

UCLA will maintain these new procedures for a minimum of three years and Class Counsel will have standing to seek relief from the Court if UCLA fails to comply. (Settlement Ex. B.)

## IV.    Notice & Claims Administration

The cost of notifying class members of the settlement and administering claims will be paid separately by UCLA and will not come out of the $73 million settlement fund. These administration costs will include compensation of the Special Master, the Special Master's Team, the Panel, and the Settlement Administrator.

The parties have selected Judge Irma Gonzalez (Ret.) to serve as the Special Master and will file a motion requesting her appointment under Rule 53 as part of the final approval process. Judge Gonzalez served as the Special Master in the *USC Student Health Center Litigation*, No. 2:18-cv-04258-SVW (C.D. Cal.), which involved similar sexual misconduct claims against an OB/GYN who worked for many years at USC, and a similar 3-tiered allocation procedure.

The parties have also selected JND Legal Administration to serve as the Settlement Administrator, subject to the Court's approval. (*See* Section V.C, *infra*) JND will be responsible for disseminating class notice, identifying and resolving any medical liens against class member claims, and distributing the settlement fund. (Settlement ¶¶ 2.6, 6.1-6.8.)

Class members will have 120 days after class notice is given to submit claims for a Tier 2 or Tier 3 award. Claims can be submitted online or by mail and the Special Master will have discretion to allow late claims so long as timely claims are still being evaluated. (Settlement ¶¶ 2.4, 6.5 & Ex. C2)

## V.    Attorneys' Fees, Costs, and Services Awards

UCLA will also pay Plaintiffs' attorneys' fees and litigation expenses separately and apart from the $73 million settlement fund. (Settlement ¶ 8.1.) Plaintiffs' counsel's application for fees and expenses will not exceed $8,760,000 (an amount equal to 12% of the settlement fund), and will be subject to Court approval. (*Id.*) Plaintiffs' counsel will also request that the Court approve service awards to the class representatives to be paid from the settlement fund. UCLA has agreed not to object to service awards of up to $15,000 for each class representative. (*Id.* ¶ 8.2)

## VI.    Released Claims

In exchange for the benefits described above, class members will release Defendants from any and all claims relating to matters alleged in the litigation. (Settlement ¶¶ 2.30-31, 3.1 & Ex. E ¶¶ 10-11.) The Settlement will not, however, release any medical malpractice or negligence claims against Dr. Heaps unrelated to sexual conduct or physician/patient boundaries, any medical malpractice or negligence claims against Dr. Heaps unknown by class members at the time of the opt-out deadline, or any claims against other UCLA practitioners that are not related to Heaps's alleged sexual misconduct. (*Id.*, ¶ 2.30.)

### LEGAL ANALYSIS

Judicial approval of class action settlements typically proceeds through three stages: (i) preliminary approval, where the court conducts an initial fairness review and decides whether to notify the class; (ii) a notice period, where class members are given an opportunity to review the settlement and raise objections; and (iii) a fairness hearing, where the court considers the overall class reaction and makes its final determination. *See* Fed. R. Civ. P. 23; *Newberg on Class Actions* § 13:1 (5th ed.).

This case is now at the preliminary approval stage, where the Court will decide whether the parties should undertake the process of notifying class members about the settlement and affording them an opportunity to lodge any objections. That decision requires the Court to make several preliminary determinations:

First, the Court should assess whether the proposed settlement is likely to be approved if notice is disseminated to the class. Fed. R. Civ. P. 23(e)(1)(B)(i).

Second, the Court should evaluate whether the proposed settlement class is likely to be certified for purposes of judgment. Fed. R. Civ. P. 23(e)(1)(B)(ii).

Third, the Court should determine whether the parties' proposed notice plan provides for the best notice practicable under the circumstances, and if so, should authorize the Settlement Administrator to disseminate notice. Fed. R. Civ. P. 23(c)(2)(B), (e)(1).

Fourth, the Court should set a schedule for notifying the class and considering its reaction to the proposed settlement. Fed. R. Civ. P. 23(e)(2).

In the sections that follow, Plaintiffs offer their analysis of each facet of the preliminary approval process.

## I.     The Settlement Is Likely to Merit Final Approval

The recent amendments to Rule 23 directed the parties to present proposed class settlements "in terms of a shorter list of core concerns." Fed. R. Civ. P. 23(e)(2), 2018 Adv. Comm. Notes. These concerns, which Rule 23(e)(2) now requires courts to consider before approving a class settlement, include two concerns bearing on procedural fairness and two bearing on substantive fairness. *Id.* The two procedural concerns are whether plaintiffs and their counsel have adequately represented the class and whether the proposed settlement was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(A)-(B). The two substantive concerns are whether the relief provided for the class is adequate and whether the proposed settlement treats class members equitably relative to one another. Fed. R. Civ. P. 23(e)(2)(C)-(D).

Plaintiffs submit that review of these four core concerns favors the proposed settlement and should give the Court confidence that it will be able to grant final approval after class members are given an opportunity to express their views.

### A.     Plaintiffs and Their Counsel Have Adequately Represented the Class

The first procedural concern asks whether the proposed settlement was the result of adequate representation. Fed. R. Civ. P. 23(e)(2)(A). One of the hallmarks of adequate representation is a thorough investigation and assessment of the class members' claims. *See id.*, Adv. Comm. Note. Formal discovery is not required, but counsel should have sufficient information to make informed decisions at the bargaining table. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).

Here, Plaintiffs' counsel were well prepared to negotiate a beneficial settlement for class members. They obtained early discovery that went to the heart of the case and reviewed over 5,500 pages of responsive documents from UCLA, interviewed more than

15

20 of Heaps's former patients, and reviewed accounts of calls with over 200 class members who contacted UCLA to report their concerning experiences after Heaps was arrested. They were also able to draw on their experience in the *USC Student Health Center Litigation*, No. 2:18-cv-04258-SVW (C.D. Cal.), which also involved allegations of serial sexual misconduct committed by a university physician, and had the benefit of prior tiered settlements that had been negotiated in other high-profile sexual misconduct cases, such as *Rapuano v. Trustees of Dartmouth College.*, No. 18-CV-1070-LM (D.N.H.), and *Doe v The Johns Hopkins Hospital*, No. 24C13001041 (Md. Cir. Ct.).

### B. The Proposed Settlement Was Negotiated At Arm's Length

"In general, evidence that a settlement agreement is arrived at through genuine arms-length bargaining with a private mediator supports a conclusion that the settlement is fair." *Potter v. Big Tex Trailer Mfg., Inc.*, No. 18-cv-1678-PSG, 2019 WL 8512459, at *6 (C.D. Cal. Sept. 26, 2019). Here, the parties' settlement was reached after two days of negotiations before Ken Feinberg and Camille Biros, two of the most experienced and respected private mediators in the country, particularly in high-profile cases of alleged sexual misconduct. (*See* Feinberg Decl. ¶ 3-5; Joint Decl. ¶¶ 21-23.) Other than agreeing that the attorneys' fees would be paid without reducing the recovery to the class, the parties did not discuss attorneys' fees until after they reached agreement on the class settlement. (*Id*. ¶ 12.) Taking into consideration both Class Counsel's preparation for the mediation and the involvement of two highly qualified private mediators, the parties' proposed settlement should be viewed as procedurally fair. Fed. R. Civ. P. 23(e)(2)(B), 2018 Adv. Comm. Note.

### C. The Relief Provided for the Class is Adequate

The settlement will provide $73 million to as many as 6,600 class members through automatic payments and a trauma-informed, tiered claims process. All class members will receive a $2,500 Tier 1 award—a base payment that acknowledges that all class members were put in harm's way and must now confront the fact they were examined by an alleged sexual predator.

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

Class members who believe Heaps engaged in sexual misconduct during a visit can obtain an additional $10,000 (for a total Tier 2 award of $12,500) by answering written questions designed to sensitively and respectfully confirm that Heaps's treatment of them exceeded the bounds of legitimate medical care. (*See* Settlement Ex. C2.)

And class members who believe Heaps engaged in sexual misconduct during a visit and who are willing to answer additional written questions and give a confidential interview with a trained specialist can obtain a Tier 3 award. The amount of Tier 3 awards will be determined by an expert panel based on its assessment of the emotional distress or bodily injury suffered by the claimant, and will range from $10,000 to $247,500 for most class members, with more available in extraordinary cases. (*Id.* & Ex. A at 3.)

These settlement tiers are comparable to those in the *USC Student Health Center Litigation*, which is in the process of distributing a $215 million settlement fund to nearly 19,000 claimants. *See* Final Approval Mem. at 3, No. 2:18-cv-04258-SVW (C.D. Cal. Nov. 18, 2019), Dkt. No. 155. The Tier 1 awards in *USC* were also $2,500, the Tier 2 awards ranged from $5,000 to $20,500, and the Tier 3 awards ranged from $5,000 to $250,500. *Id.* at 6. The settlement in the USC matter was favorably received by class members and the claims procedure is nearing conclusion.

The institutional reforms that UCLA has agreed to implement will also benefit class members and other members of the public who seek medical care at UCLA facilities in the future. The new policies that will govern sexual misconduct in a clinical setting at UCLA will help ensure that physicians who sexually harass or abuse their patients will be promptly reported and prohibited from continuing to see patients.

The collective relief offered by the Settlement is even more favorable when considered in light of the factors delineated in Rule 23(e)(2)(C): (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed distribution and claims process; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).

17

### 1.     The Risk, Delay, and Other Drawbacks Associated with Further Litigation Are Substantial

If class members were to instead pursue litigation against UCLA, they would face numerous obstacles and risk a lengthy, emotionally exhausting process with uncertain prospects for success. All class members would need to prove that UCLA was adequately apprised of Heaps's conduct and deliberately allowed him to continue seeing patients. Even if other doctors and nurses had received reports of Heaps's misconduct, UCLA could still argue that those with authority to act on behalf of UCLA were never notified. *See Doe v. Roman Catholic Diocese of Covington*, No. 03-CI-00181, 2006 WL 250694, at *4 (Ky. Cir. Ct. Jan. 31, 2006) (approving class settlement where "most, if not all similar cases have been dismissed before trial because the statute of limitations has expired, or because the Diocese was not on notice that the abuser was a pedophile").

Even successful litigation would take years and impose heavy financial and emotional costs. Lawsuits alleging sexual abuse or misconduct are notoriously hard on the victims, who are forced to relive a traumatic event for years on end, and divulge sensitive and embarrassing details. One of the greatest appeals of a class settlement is that it offers victims a meaningful recovery without first exacting a hefty emotional toll. *See Jane Doe 30's Mother v. Bradley*, 64 A.3d 379, 395 (Del. Super. Ct. 2012) ("the emotional costs of litigation cannot be ignored").

### 2.     The Proposed Distribution of the Settlement Proceeds Is Designed to Be Effective

The $73 million settlement fund will not revert to defendants and will not be used to pay for notice, settlement administration, or attorneys' fees. It will be disbursed to class members through automatic payments, in the case of the $2,500 Tier 1 awards, or through a trauma-informed claims process designed to fairly apportion the fund among the class under the supervision of a highly-qualified, Court-appointed special master. (*See generally* Settlement Ex. A.)

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

### 3.    Attorneys' Fees Will Be Awarded and Paid Separately

Plaintiffs' counsel will seek attorneys' fees through a separate motion that will be supported by documentation of their hours, rates, and expenses. The amount awarded will be paid by UCLA separately and apart from the $73 million settlement fund reserved for class members. The parties propose that the fee application be deferred until after the Special Master has substantially completed her evaluation of class member claims. (Settlement ¶ 8.1.) The fee award will not exceed 12% of the amount of the settlement fund, nor reduce the benefits to class members, and the Court will not be asked to approve the fee payment until information about the success of the distribution process is available for the Court's consideration. The amount and timing of the fee proposal accordingly favor approval of the proposed settlement under Rule 23(e)(2)(C)(iii).

### 4.    There Are No Undisclosed Side Agreements

No agreements were made in connection with the Settlement aside from the Settlement itself. *See* Fed. R. Civ. P. 23(e)(3).

## D.    The Proposed Settlement Treats Class Members Equitably

The Settlement devotes a great deal of resources to ensuring the settlement proceeds are distributed in a fair, equitable, and sensitive manner—all of which will be paid by UCLA separately. All class members will receive a $2,500 base payment to compensate them for the common injury each suffered when UCLA exposed them to an OB/GYN with a disturbing history of alleged sexual misconduct. But because class members suffered varying degrees of emotional distress and bodily harm as a result of that common exposure, the Settlement provides for escalating tiers of recovery. The tiers allow for class members to choose the degree of engagement they will have with the settlement process, and provides those most harmed with an opportunity to seek additional compensation through a compassionate process overseen by a Court-appointed special master and an expert panel. This type of tiered claims process has been successful in several other cases involving widespread sexual misconduct, including in

19

the *USC Student Health Center Litigation*, *Doe v. The Johns Hopkins Hospital, Doe v. Roman Catholic Diocese of Covington*, and *Rapuano v. Trustees of Dartmouth College.* As the court put it in *Rapuano*, a tiered claims process "ensures that all class members receive some recompense and establishes a reasonable and confidential mechanism for apportioning additional compensation according to relative harm suffered." 2020 WL 475630 at *13 (D.N.H. Jan. 29, 2020).

## II.     The Settlement Class Is Likely To Be Certified

If at the preliminary approval stage, "a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Note. Here, the parties' proposed class meets all the requirements of Rule 23(a) and Rule 23(b)(3), and can be certified by the Court at the final approval stage.

### A.     The Class Meets the Requirements of Rule 23(a)

#### 1.     Numerosity

The Settlement class consists of at least 5,000 women, making joinder of all members impracticable. Fed. R. Civ. P. 23(a)(1).

#### 2.     Commonality

Plaintiffs' and class members' claims depend upon common contentions of fact and law that could be resolved for all through a single proceeding. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). For example, Plaintiffs' Title IX claims against UCLA depend on the common contentions that UCLA knew or reasonably should have known about Heaps's history of sexual misconduct; that UCLA failed to take action due to a policy of deliberate indifference to reports of sexual misconduct against its physicians; and that UCLA's policy of deliberate indifference created a heightened risk that Plaintiffs and class members would be sexually harassed or assaulted at UCLA facilities. Compl. ¶¶ 118-71, 197-209. Each of those contentions depend only on what UCLA knew, did, or didn't do, and could be established (or not established) with generalized evidence applicable to the entire class. *See Rapuano*, 334 F.R.D. at 651

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

(whether institution had knowledge of sexual misconduct and whether it responded with deliberate indifference to that knowledge are both common questions); *Lecenat v. Perlitz*, No. 3:13-CV-01633-RNC, 2019 WL 3451571, at \*14 (D. Conn. Feb. 11, 2019) (common questions included whether school was negligent in hiring or failing to protect class members from sexual predator); *In re USC Student Health Center Litigation*, No. 2:18-cv-04258-SVW, Dkt. No. 172 at 3 (Feb. 25, 2020) (common issues included university's failure to terminate or otherwise discipline allegedly abusive physician).

### 3.   Typicality

The typicality requirement is also satisfied, as "the unnamed class members have injuries similar to those of the named plaintiffs and the injuries result from the same, injurious course of conduct." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868-69 (9th Cir. 2001). Plaintiffs and class members allege varying degrees of injuries, but each claims exposure to the same sexual predator due to UCLA's negligent hiring practices and deliberate indifference to prior reports of sexual misconduct. *See Rapuano*, 334 F.R.D. at 648 ("Courts have found typicality satisfied where a group of putative class members are exposed to the systematic failures of an institution.")

### 4.   Adequacy

Plaintiffs are adequate representatives of the class, as they have no conflicts of interests with other class members and have retained experienced counsel to vigorously represent the class's interests. *Staton v. Boeing Co.*, 327 F.3d 938, 956 (9th Cir. 2003). Plaintiffs' counsel have decades of experience representing plaintiffs in complex class action litigation, including in sexual misconduct cases. (Joint Decl. ¶ 48 & Exs. 2-4.) The settlement before the Court is a product of Plaintiffs' willingness to fight not only for themselves, but for all others who were similarly exposed to Heaps.

**B.     The Class Meets the Requirements of Rule 23(b)(3)**

   **1.     Predominance**

The predominance requirement is satisfied when class members' claims can be proven predominantly using common, class-wide evidence rather than evidence that varies from class member to class member. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Plaintiffs' case against UCLA is premised on a "pre-assault" theory. As the Ninth Circuit recently explained, a pre-assault claim is one that relies on events that occurred *before* Heaps allegedly sexually harassed and assaulted Plaintiffs: by maintaining a general policy of deliberate indifference to reports of sexual misconduct by its physicians, UCLA heightened the risk that Plaintiffs and other class members would be assaulted or harassed during their medical appointments with Heaps. *See Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1099, 1112 (9th Cir. 2020).

Because Plaintiffs' pre-assault claims are focused primarily on UCLA's general policy toward sexual misconduct in the clinical setting, and not on the circumstances surrounding any particular instances of assault or harassment, they are well-suited for class treatment. UCLA's liability can be established largely if not entirely through generalized, class-wide evidence. There would be little need for class members to present individualized evidence until the damages phase, and it is well established that the need for individualized findings as to the amount of damages is not enough, by itself, to defeat class certification. *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

   **2.     Superiority**

The alternative to a class proceeding for class members is individualized litigation. Over one hundred of Heaps's former patients have filed individual lawsuits, but more than 6,000 have chosen not to file suit. As discussed above, sexual misconduct litigation is risky, time-consuming, and expensive, like all litigation. Sexual misconduct litigation is also uniquely invasive—and imposes emotional costs that many trauma victims are not prepared to endure. One of the great virtues of a class settlement in sexual

misconduct cases is that it can provide substantial compensation for victims who otherwise would not have come forward—and can do so through a confidential, expert-driven process designed not to re-traumatize victims in the way that litigation so often can. *See Rapuano,* 2020 WL 475630 at *12 ("courts have recognized that class adjudication of sexual abuse claims is preferable to individual litigation because it encourages more victims to come forward and avoids re-traumatization").

### III.   The Proposed Notice Plan Meets All Applicable Requirements

#### A.   The Notice Plan Uses The Best Practicable Means To Reach Class Members

The federal rules require that before finally approving a class settlement, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). Where the settlement class is certified pursuant to Rule 23(b)(3), the notice must also be the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

The parties' notice plan meets these requirements. It provides for individual, mailed notice to the roughly 5,000 class members who could be identified from UCLA's patient records. (Settlement ¶¶ 6.2, 10.6.) For those who cannot be identified in UCLA's records, the notice plan provides for digital notice through Google banners and Facebook ads, through publications in the *LA Times* and *People* magazine, and through a national press release. This supplemental notice is reasonably calculated to reach additional class members and apprise them of the settlement as well.

#### B.   The Proposed Notice Adequately Informs Class Members of their Rights and Options Under the Settlement

The notice provided to class members should "clearly and concisely state in plain, easily understood language" the nature of the action; the class definition; the class claims, issues, or defenses; that the class member may appear through counsel; that the court will exclude from the class any member who requests exclusion; the time and

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

manner for requesting exclusion; and the binding effect of a class judgment on class members. Fed. R. Civ. P. 23(c)(2)(B). The forms of notice proposed by the parties complies with these requirements. (*See* Settlement ¶¶ 6.1-6.8.)

### C.    The Proposed Settlement Administrator Is Qualified and Experienced

The notice plan before the Court was prepared by JND Legal Administration. (*See* Keough Decl.) JND was recently recognized as the best claims administrator in the country by *New York Law Journal*, and has effectively served as the settlement administrator in dozens of complex class actions and mass tort cases, including the *USC Student Health Center* settlement. (*See id*. at ¶¶ 3, 6-8, Ex. A.) The parties propose that JND be appointed Settlement Administrator here as well, and authorized to disseminate notice pursuant to the terms of the proposed notice plan.

### IV.    Schedule

The next steps in the settlement approval process are to schedule a final approval hearing, notify the class of the Settlement and hearing, and allow class members an opportunity to opt out of the Settlement or object to its terms.

Toward these ends, the parties propose the following schedule:

| Event | Date |
|---|---|
| Claims Administrator sends Notice ("Notice Date") | Within 28 days after entry of this Order |
| Objection and Opt-out Deadline | 90 days after Notice Date |
| Motion for Final Settlement Approval Due | 110 days after Notice Date |
| Deadline to Submit Claim Forms and Statement of Class Membership Forms | 120 days after Notice Date |
| Final Approval Hearing | _____ [No earlier than 125 days after Notice Date] |
| Special Master files Report on Claims Process | Within 28 days after completion of Claims Process |
| Motion for Award of Attorneys' Fees, | Within 14 days after Special Master |

24

| Event | Date |
|---|---|
| Costs, and Service Awards to Class Representatives ("Fee Motion") Due | files Report on Claims Process |
| Deadline to Object to Fee Motion | 30 days after Fee Motion is filed and made available to Class Members on the Settlement website |
| Reply in Support of Fee Motion Due | No later than 14 days before the Hearing on the Fee Motion |
| Hearing on Fee Motion | TBD |

## CONCLUSION

The revelation that Heaps sexually harassed and abused patients at UCLA facilities over the course of several decades demands a response from the judicial system. Individualized litigation is one option, but a frightening and impracticable one for many women. The proposed settlement offers a better way and Plaintiffs respectfully request that the Court grant it preliminary approval.

Respectfully submitted,

Dated: November 16, 2020                    /s/ *Daniel C. Girard*

Daniel C. Girard (State Bar No. 114826)
Jordan Elias (State Bar No. 228731)
Trevor T. Tan (State Bar No. 281045)
Makenna Cox (State Bar No. 326068)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
dgirard@girardsharp.com
jelias@girardsharp.com
ttan@girardsharp.com
mcox@girardsharp.com

25

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)

Elizabeth A. Kramer (State Bar No. 293129)
**ERICKSON KRAMER OSBORNE LLP**
182 Howard Street
San Francisco, CA 94105
Telephone: (415) 635-0631
Facsimile: (415) 599-8088
elizabeth@eko.law

Eric H. Gibbs (SBN 178658)
Amy M. Zeman (SBN 273100)
Amanda M. Karl (SBN 301088)
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701
ehg@classlawgroup.com
amz@classlawgroup.com
amk@classlawgroup.com

*Counsel for Plaintiffs*

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL
CASE NO. 2:20-cv-09555-RGK (Ex)